Filed 6/24/15 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Elias V., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>Elias V.,<br><br>        Defendant and Appellant. | A140263<br><br>(Sonoma County<br>Super. Ct. No. 37612J)<br><br>**ORDER MODIFYING OPINION<br>NO CHANGE IN JUDGMENT** |

**THE COURT**:

It is ordered that the opinion certified for publication and filed herein on June 9, 2015, be modified as follows:

1.  At page 3, replace the year 2013 with 2012, in the fourth sentence of the last paragraph, to read as follows:

> The landlord never told Aurora that Elias's family asked her to evict her family, and denied that the eviction, which took place in November 2012, was retaliation for Aurora's accusations against Elias.

2.  At page 5, in the first line of the second paragraph, replace the year 2013 with 2012, to read as follows:

> After Aurora phoned the police on October 23, 2012, Sonoma County Deputy Sheriff Carlos Chavez was instructed to look into the matter and make an "incident report" that would be used to decide whether a detective should be assigned to investigate the case.

1

There is no change in the judgment.


Dated: _____          _____
                                                     Kline, P.J.

Trial Court:                                   Sonoma County Superior Court

Trial  Judge:                                  Hon. Raima Ballinger

Attorneys for Defendant and Appellant:         Under appointment by the First
                                               District Court of Appeal
                                               L. Richard Braucher


Attorneys for Amicus Curiae on behalf of       Center on Wrongful Convictions of Youth
Defendant and Appellant:                       Megan G. Crane
                                               Joshua A. Tepfer

Attorneys for Plaintiff and Respondent:        Attorney General of California
                                               Kamala D. Harris

                                               Gerald A. Engler
                                               Senior Assistant Attorney General

                                               Eric D. Share
                                               Supervising Deputy Attorney General

                                               Sharon G. Birenbaum
                                               Deputy Attorney General

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Elias V., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>Elias V.,<br><br>　　　Defendant and Appellant. | A140263<br><br>(Sonoma County<br>Super. Ct. No. 37612J) |

　　　In an original wardship petition (Welf. & Inst. Code, § 602), appellant, Elias V., then 13 years of age, was alleged to have committed a lewd and lascivious act upon a child under the age of 14 years. (Pen. Code, § 288, subd. (a).)[1] Prior to and again at the time of the jurisdictional hearing, defense counsel moved to exclude inculpatory statements appellant made to the police on the ground they were involuntary and therefore inadmissible under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). After a three-day hearing, the motion was denied and the petition sustained. Elias was declared a ward of the court and placed on probation in the home of his parents.

　　　Elias claims his confession was involuntary under the due process clause of the Fourteenth Amendment, as it was the product of the type of coercive interrogation techniques condemned in *Miranda*, which had "overborne his will." Contending the statements were erroneously received in evidence and cannot be considered harmless, he maintains the judgment must be reversed. We agree.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

1

Elias and his friend Hector T. lived across the hall from one another in a four-unit apartment building in Santa Rosa. The boys usually played together at Elias's apartment, but on October 6, 2012, they played at Hector's apartment in a bedroom shared by Hector, his mother, father, brother, and sister A.T., who was then 3 years old. Hector, nine years old at the time of the hearing, testified that while he and Elias were playing a video game, Elias lying on the bed and Hector sitting on the floor, A.T. climbed on the bed and lay down near Elias. Hector could not see the top of the bed from where he was sitting and did not hear anything Elias was saying. A.T. was laughing, the bedroom door was open, and Hector's mother, Aurora, was in another room. The boys continued playing their video game until Aurora entered the room. Hector testified that when she came in, Elias was sitting on the bed. Aurora testified that when she entered the room she saw Elias lying on the edge of the bed next to A.T. and noticed that when A.T. got up her pants were at the middle of her leg. When Aurora asked, "what happened?" Elias said A.T. asked him to help take off her pants because "she wanted to go to the bathroom." Aurora described Elias as "surprised" and "scared."

Aurora never testified that she saw Elias improperly touch A.T. on October 6th or at any other time. She believed he did only because the child was "talking about it all the time," telling her and others, " 'This boy, he touched me.' He did this he did that, you know, just in my head." A.T. was interviewed on February 1, 2013, at the Redwood Children's Center (RCC) by a person trained in interviewing very young children, and the interview was recorded, but the recording was never offered in evidence and the interviewer did not testify. The detective assigned the case, Mechelle Buchignani, observed the interview but was not asked about it by the prosecutor. However, on cross examination, she stated that A.T. "did say that he touched her in the RCC interview," [2]

---

[2] Detective Buchignani also testified, more definitively, that the child was "very clear" about being touched by Elias *"[i]n what she told her parents."* Buchignani testified that the RCC interview lasted only 10 minutes and was a "fairly typical 3-year-old interview." Asked if she recalled that A.T. "doesn't know how to count, she doesn't know her colors, she doesn't know where her head is," Buchignani responded, "I believe she knows where her head is. She didn't follow directions with moving the pen."

and that she "showed us where he touched her" by pointing to the vaginal area on a doll. Asked, "[so she] doesn't point to the stomach," the detective responded, "[l]ooked like the vaginal area to me."

Aurora did not contact the police until October 23, 17 days after the incident, and her delay in reporting it became an issue at the jurisdictional hearing. The defense maintained that Aurora concocted the charge against Elias and contacted the police because she had just learned that the landlord intended to evict her family and falsely believed Elias's father had put the landlord up to this.

The landlord testified that starting before 2011, when Elias's family moved in, she frequently spoke with Aurora and her husband Carlos about complaints from tenants on both floors of the building and from neighbors that people living in or visiting Aurora's apartment (including Aurora's husband and children, her brothers, and others) were playing loud music, playing volleyball and "drinking alcohol a lot" in the backyard, obstructing the carport, and "peeing" in the yard and in the laundry room. The landlord repeatedly told Aurora " 'please, you need to stop the drinking, the loud music. It just needs to stop.' And, like I said, I would go there at least once a week just telling them, 'Hey, you need to cut it out.' "

The landlord finally realized "the complaints had gotten out of hand" when she learned from Elias's father that Aurora's brother, "wanted to take a swing" at him. Elias's father "was scared, and you could hear it in his voice." She evicted the family because she was "sick and tired" of the problems; the incident with Elias's father "put the topping on the cake." The landlord never told Aurora that Elias's family asked her to evict her family, and denied that the eviction, which took place in November 2013, was retaliation for Aurora's accusations against Elias. The landlord warned Aurora about eviction on October 22, the day after she heard about the incident with Elias's father, and had also warned them previously that their behavior could lead to eviction, although at

---

Buchignani agreed that A.T. was "off into some other subject matter" when asked questions. Asked whether the interview was so short in part because A.T. was not giving information that would be helpful, Buchignani stated, "She gave us enough information to believe she had been touched."

another point she testified that the first time she discussed eviction with any member of Aurora's household was in October 2012.

Aurora complained to the police on October 23, the day after the landlord told her that her family was going to be evicted, but she denied that this had anything to do with Elias's father complaining to the landlord about her family's conduct. Her testimony on this issue, however, was inconsistent and confusing. According to Aurora, after she reported the incident with Elias and A.T., the landlord told Aurora's sister-in-law that she was going to evict Aurora because of this report. Asked whether the landlord came to talk to her on October 20, shortly before she reported the incident to the police, Aurora responded that the landlord came that day to pick up the rent, and she asked her son Hector to "interpret for me and to tell her . . . [¶] [w]hat the boy, [Elias], had done to my daughter." Aurora testified that the landlord did not say she was going to evict Aurora, only that she "wanted proof" of what [Elias] had done to A.T. Asked several times whether she told the landlord that her family could not be evicted "because [Elias] had touched [her] daughter," Aurora refused to give a responsive answer until directed to do so by the court, after which she stated "No." Aurora then testified that she did not remember any conversation with the landlord in October 2012: "I don't remember having spoken to [the landlord] before she gave me the eviction notice" on November 23.[3] And, further confusing matters, Aurora testified that she met with the landlord on October 9, three days after the incident, and told her "what this boy has done to my daughter." In response to the question why she had waited 17 days to report Elias's conduct to the police, Aurora said she didn't go immediately because the landlord said "she wanted proof. So then I said, 'Okay. I'm going to file a report so that I can give you proof.' She has—*my daughter has to say what happened to her*." (Italics added.)

---

[3] Aurora testified that before the eviction notice on November 23, the landlord had never told her of complaints from other tenants or warned her about loud music or fights near her apartment. Aurora acknowledged that prior to October 6, the landlord had threatened to evict her because of males from her apartment urinating in public in front of the apartment, but stated that she had not seen "anything like that," her family members denied it happening, and the neighbors the landlord said had complained about it denied having done so.

Aurora said she did not go to the police immediately after the incident because "I didn't want to get to a point where the problem gets the way that it's turned out right now. That is why I spoke to the landlord to tell her what kind of people she had there." Asked why she waited another two weeks to contact the police, Aurora said, "I did not know what to do. My daughter . . . was always talking about the same things, saying 'This boy, he touched me.' He did this he did that, you know . . . so I thought if I leave things the way they are, then my daughter's going to end up being raped." On October 23, a friend told her to go to the police and she did so.

After Aurora phoned the police on October 23, 2013, Sonoma County Deputy Sheriff Carlos Chavez was instructed to look into the matter and make an "incident report" that would be used to decide whether a detective should be assigned to investigate the case. On October 24, Chavez met with Aurora, who told him she believed Elias "had assaulted her daughter" on October 6th. Chavez did not interview anyone other than Aurora before submitting his incident report to the detectives for further investigation. Detective Buchignani was assigned to the case on October 24.

About a month after Officer Chavez took Aurora's statement regarding Elias, he was "dispatched" to look into a "complaint between neighbors" at the apartment house where Elias and Aurora lived. The complainant, Elias's father, was concerned "that his next-door neighbors were rowdy, were constantly drinking downstairs in a picnic area, urinating on the fence, and there may have been a challenge to fight him, and him stating he didn't want any problems." Officer Chavez spoke with Aurora's husband, related Elias's father's concerns and told Elias's father and Aurora's husband "to stay away from each other and be peaceful," and "that was the end of the investigation."

Detective Buchignani interrogated Elias on February 6, 2013, more than three months after the case was assigned to her. At the time of the interrogation,[4] Buchignani's knowledge of the case was apparently based solely on Aurora's statement to Officer Chavez, which was in turn based entirely on Chavez's brief interview of Aurora, and

---

[4] As we later explain (see especially discussion, *post*, at pp. 34-35), an "interrogation" is significantly different from an "interview." Interrogation is an accusatory process involving active persuasion. An interview is a non-accusatory investigative tool designed to gather information and normally precedes an interrogation.

Buchignani's observation of the 10-minute interview of A.T.[5] Buchignani stated that at the time she interrogated Elias the Sheriff's Office had not "[made] contact with anyone other than Aurora." Neither Buchignani, nor, so far as she knew, any other officer, asked residents of the apartment complex about Elias's behavior or whether "other children had been disturbed by Elias or anyone else."

On the day of the interrogation, Detective Buchignani, her partner Sergeant Ruben Martinez, and another unidentified deputy sheriff went to the elementary school to speak with Elias. The principal brought them to a small office used by a school counselor. When the principal returned to the room with Elias, Buchignani introduced herself and Sergeant Martinez, told Elias she had to tell him his legal rights, and then gave him the admonitions required by *Miranda*. Asked whether he ever previously had any contact with the police, Elias answered "no."

The subsequent interrogation, which we later relate in greater detail, consumed 20 to 30 minutes. Throughout the session, Buchignani stated as a fact that Elias had touched A.T. in a sexual manner and needed help for his problem of attraction to a young child. For the vast majority of the interrogation, Elias adamantly denied Buchignani's repeated assertions that he had touched A.T. in an improper manner; he portrayed A.T. as a somewhat annoying, very young child clamoring for his attention. and repeatedly explained that he had simply unzipped the child's pants at her request. Finally, when Buchignani suggested Elias might have touched A.T.'s vagina because he found it exciting or just because he was curious, Elias rejected the first suggestion and, to Buchignani's comment, "[b]ut you did it," said, "[f]or curiosity." Elias thus accepted Buchignani's alternative theory that he touched the bare skin of A.T.'s vagina for three to four seconds, in the midst of playing a video game with her brother, merely "out of curiosity."

_____

[5] Buchignani testified that she believed Elias's denials in the interrogation were lies because "the child was very clear about being touched by him . . . [i]n what she told her parents." Asked what Aurora told her that made her believe Elias touched A.T., Buchignani replied, "What the child told the mother per the [incident] report." Buchignani met with Aurora on January 1, 2013, to discuss the RCC interview and "see if they wanted to move forward with the case" but did not mention the contents of their discussion in her testimony.

6

Before and again at the jurisdictional hearing, defense counsel moved to exclude the statements on the grounds they were involuntary. On August 22, 2013, after the court took the case under submission, the court impliedly denied the motion and ruled that the charged offense had been committed.

In finding Elias's statements voluntary and reliable, the court observed that Detective Buchignani's manner was "gentle" and "calm," her questions "were short," not "convoluted," "the questions weren't split where there would be two responses you'd have to use to the same single question," and "her language usage for someone of Elias's age was appropriate." The court summed up its view this way: "Just the totality of where the interview took place was, in the court's view, not intimidating. It was very short. It was only a 20-minute interview. And it complied with the current case law. I don't have a problem with the way the interview was conducted." The court noted that "Elias was able to indicate in the flow of conversation [with Detective Buchignani] if he needed clarification of anything, and he did that a couple of times, and there was give and take in the conversation. In other words, sometimes he asked questions too, and that's what really made me feel that this interview was appropriate." The court thus impliedly concluded that Elias's statements were "the product of his free and rational choice." (*Greenwald v. Wisconsin* (1968) 390 U.S. 519, 521.)

After the jurisdictional ruling, the Sonoma County Juvenile Probation Department interviewed Elias and his parents. Its report to the court states that Elias, who had never previously been charged with any delinquency, "indicated he only tried to help the young girl. The minor stated [that] prior to this incident, he liked helping other people and learned this trait from his father. As a result of this incident, he no longer wants to help others, as he feels his actions could be taken the wrong way. The minor maintains he did not commit this offense, was at her home playing video games with the victim's younger brother, and the only thing he did was to try to help her." Elias's parents "maintain their son's innocence, and stated the only thing their son did was to try to help the girl. They report the allegations stem from a dispute with the victim's family because they blame the minor's father for being evicted." Elias's mother said the charges against Elias have "caused a lot of conflict within the family as she told the minor's father if he had not said

7

anything to the landlord this situation would never have occurred." Elias's parents also told probation officers that "Elias grew very frustrated over these proceedings and kept telling them he would admit to anything just to get this over with. However, they kept telling their son not to admit to something he did not do just because he was tired and frustrated. They believe this outcome is not 'just,' and they will continue their pursuit of the truth."

At the close of the dispositional hearing the court declared Elias a ward of the court and placed him on probation at the home of his parents, with numerous conditions.

Notice of this appeal, which is authorized by Welfare and Institutions Code section 800, was timely filed on November 7, 2013.

## DISCUSSION

## I.

The chief issue presented in this appeal is the voluntariness of the admissions Elias made at the close of Detective Buchignani's interrogation. The use of an involuntary confession for any purpose in a criminal or delinquency proceeding violates a defendant's or minor's rights under the Fourteenth Amendment. (*Arizona v. Fulminante* (1991) 499 U.S. 279.)

"The admissibility of a confession depends upon the totality of the circumstances existing at the time the confession was obtained. (*People v. Robertson* (1982) 33 Cal.3d 21, 39-40; *People v. Sanchez* (1969) 70 Cal.2d 562, 572, cert. dism., *Sanchez v. California* (1969) 394 U.S. 1025.) A minor can effectively waive his constitutional rights (*People v. Lara* (1967) 67 Cal.2d 365, 390-391, cert. den. *Lara v. California* (1968) 392 U.S. 945 . . . [fn. omitted] but age, intelligence, education and ability to comprehend the meaning and effect of his confession are factors in that totality of circumstances to be weighed along with other circumstances in determining whether the confession was a product of free will and an intelligent waiver of the minor's Fifth Amendment rights ([*Lara*]*,* at pp. 385-387)." (*People v. Maestas* (1987) 194 Cal.App.3d 1499, 1508.)

The federal and state Constitutions both require the prosecution to show the voluntariness of a confession by a preponderance of the evidence. (*Lego v. Twomey* (1972) 404 U.S. 477. 489; *People v. Markham* (1989) 49 Cal.3d 63, 71.) Voluntariness

8

turns on *all* the surrounding circumstances, "both the characteristics of the accused and the details of the interrogation" (*Schneckloth v. Bustamante* (1973) 412 U.S. 218, 226); it does not depend on whether the confession is trustworthy. (*Rogers v. Richmond* (1961) 365 U.S. 534, 543-544.) While a determination that a confession was involuntary requires a finding of coercive police conduct (*Colorado v. Connelly* (1986) 479 U.S. 157; *People v, Maury* (2003) 30 Cal.4th 342, 404), " ' "the exertion of any improper influence" ' " by the police suffices. (*Hutto v. Ross* (1976) 429 U.S. 28, 30.)

The issue of voluntariness presents " 'a mixed question of law and fact that is nevertheless predominantly legal . . . .' [Citation.] Hence ' "[o]n appeal, the determination of a trial court as to the ultimate issue of voluntariness of a confession is reviewed independently . . . . [¶] The trial court's determination concerning whether coercive police activity was present, whether certain conduct constituted a promise and, if so, whether it operated as an inducement, are apparently subject to independent review as well." [Citation.] However, "the trial court's findings as to the circumstances surrounding the confession—including 'the characteristics of the accused and the details of the interrogation' [citation]—are clearly subject to review for substantial evidence. . . ." ' [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

## II.

As appellant asserts the techniques employed by Detective Buchignani to overcome his will were condemned by the Supreme Court in *Miranda, supra,* 384 U.S. 436, we commence our analysis by discussing the portions of that opinion describing such techniques.

The foundational theses of *Miranda* are that "the modern practice of in-custody interrogation is psychologically rather than physically oriented" (*Miranda, supra,* 384 U.S. at p. 448), and the psychological techniques now employed by interrogators "trade[] on the weakness of individuals," and "may even give rise to a false confession." (*Id.* at p. 455, & fn. 24, citing Borchard, *Convicting the Innocent* (1932).)

The danger of false confessions is real. Studies conducted after *Miranda* was decided estimate that between 42 and 55 percent of suspects confess in response to a custodial interrogation. (Kassin & Gudjonsson, *The Psychology of Confessions: A*

*Review of the Literature and Issues*, 5 Psych Sci. in the Public Interest 33, 44.)[6] Estimates of false confessions as the leading cause of error in wrongful convictions range from 14 to 25 percent, and as will be discussed (see, *post*, at pp. 21-25), a disproportionate number of false confession cases involve juveniles. Recent research has shown that more than one-third (35 percent) of proven false confessions were obtained from suspects under the age of 18. (Drizin & Leo, *The Problem of False Confessions in the Post-DNA World* (2004) 82 N.C.L.Rev. 891, 902, 944-945, fn. 5 (*False Confessions*).)

Since *Miranda*, the Supreme Court has continued to express concern about false confessions. In *Corley v. United States* (2009) 556 U.S. 303, 320-321, the court observed again that " '[c]ustodial police interrogation, by its very nature, isolates and pressures the individual,' [citation] and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed." (*Ibid.* ) Even more recently, the court indicated that its long-standing concern about false confessions may be most acute in cases involving the police interrogation of juveniles, particularly adolescents. (*J.D.B. v. North Carolina* (2012) ___U.S.___ [131 S.Ct. 2394, 2401] (*J.D.B.*).) An extensive body of literature demonstrates that juveniles are "more suggestible than adults, may easily be influenced by questioning from authority figures, and may provide inaccurate reports when questioned in a leading, repeated and suggestive fashion" (Meyer & Reppucci, *Police Practices and Perceptions Regarding Juvenile Interrogation and Interrogative Suggestibility* (2007) 25 Behavioral Sciences & the Law 757, 763; see also, Ceci & Bruck, *Suggestibility of The Child Witness: A Historical Review and Synthesis* (1993) 113(3) Psychological Bulletin 403-409; Dunn, *Questioning the Reliability of Children's Testimony: An Examination of the Problematic Elements* (1995) 19 Law & Psych. Rev. 203-215; Owen-Kostelnick et al., *Testimony and Interrogation of Minors: Assumptions About Maturity and Morality* (2006) 61(4) American Psychologist 286-304), and that

---

[6] The growing body of research evaluating the manner in which interrogative practices influence suspects and lead them to confess has profited from the increasing practice of recording custodial interrogations. (Ofshe & Leo, *The Decision to Confess Falsely* (1997) 74 Denver U. L.Rev. 979, 981-982 (*Decision to Confess Falsely*).)

"juveniles aged fifteen and younger have deficits in their legal understanding, knowledge, and decision-making capabilities." (Redlich, *The Susceptibility of Juveniles to False Confessions and False Guilty Pleas* (2010) 62 Rutgers L.Rev. 943, 952 (*Susceptibility of Juveniles*); see Viljoen et al., *Legal Decisions of Preadolescent and Adolescent Defendants: Predictors of Confessions, Pleas, Communication with Attorneys, and Appeals* (2005) 29(3) Law & Human Behavior 253; Overbeck, *No Match for the Police: An analysis of Miranda's Problematic Application to Juvenile Defendants* (2011) 38 Hastings Const. L.Q. 1053, 1066-1069 (*No Match*).)

Noting that interrogation at that time largely took place in private, and "privacy results in secrecy" which "in turn results in a gap in our knowledge of what in fact goes on in the interrogation rooms," the *Miranda* court relied heavily on police manuals and texts relating to interrogation. (*Miranda, supra*, 384 U.S. at p. 448.) As these texts recommend tactics that have been effectively employed to obtain confessions, they "are used by law enforcement agencies themselves as guides . . . [and] professedly present the most enlightened and effective means presently used to obtain statements through custodial interrogation." (*Id.* at p. 449.) These techniques, and indeed updated versions of many of the same texts, continue to be widely used today.

John E. Reid & Associates was the largest national provider of training in interrogation techniques at the time *Miranda* was decided, and still is today. The basic course on "The Reid Technique" is predicated on the methodology first set forth in the initial edition of Inbau & Reid, Criminal Confessions and Interrogations (1962), a classic work which was quoted extensively by Chief Justice Warren in *Miranda*. The current Reid training manual, which remains the leading law enforcement treatise on custodial interrogation, was published in 2013. (Inbau et al., Criminal Interrogation and Confessions (5th ed. 2013) (hereafter Criminal Interrogation).) It has been estimated that about two-thirds of police executives in this nation have had training in the "Reid Method." (Zalman & Smith, *The Attitudes of Police Executives Towards Miranda and Interrogation Policies* (2007) 97 J. Crim. L. & Criminology 873, 920.) [7]

---

[7] In California, local law enforcement agencies officers who may not have attended a Reid program receive training from academies whose curricula, mandated and

As will be seen, many of the techniques used to interrogate Elias derive from the Reid methodology described in *Miranda*. Behavioral scientists who study interrogation techniques and their effects have concisely described the Reid Technique as follows: "First, investigators are advised to isolate the suspect in a small private room, which increases his or her anxiety and incentive to escape. A nine-step process then ensues in which an interrogator employs both negative and positive incentives. On one hand, the interrogator confronts the suspect with accusations of guilt, assertions that may be bolstered by evidence, real or manufactured, and refuses to accept alibi's and denials. On the other hand, the interrogator offers sympathy and moral justification, introducing 'themes' that minimize the crime and lead suspects to see confession as an expedient means of escape." (Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations* (2010) 34 Law & Human Behav. 3, 7 (*Police-Induced Confessions*).)[8] According to these authors, the purpose of interrogation is "not to discern the truth, determine if the suspect committed the crime, or evaluate his or her denials. Rather, police are trained to interrogate only those suspects whose culpability they 'establish' on the basis of their initial investigation." (*Id*. at p. 6.)

---

approved by the Commission on Peace Officer Standards and Training (POST) (Pen. Code, § 13510, subd. (a); Cal. Code Regs, tit. 11, § 1005, subd. (a)), which teach interrogation techniques similar to those promoted by the Reid program. (Weisselberg, *Mourning Miranda* (2008) 96 Cal. L.Rev. 1519, 1533-1534 and Appen. (*Mourning Miranda*).)

[8] "The first interrogation step is 'a direct, positively presented confrontation of the suspect with a statement that he is considered to be the person who committed the offense.' . . . [¶] The second step introduces a theme for the interrogation, a reason for the commission of the crime, which may be a moral (but not legal) excuse or a way for the suspect to rationalize her actions. . . . The suspect may deny involvement in the offense, which leads to step three, overcoming denials. . . . The next steps, four through six, guide the investigator in overcoming the suspect's reasons why he would not or could not commit the crime, keeping the suspect's attention and handling a suspect's passive mood. [¶] Step seven is critical. Here the officer formulates alternative questions, one of which is 'more "acceptable" or "understandable" than the other.' The question is followed by a statement of support for the more morally acceptable alternative. However, '[w]hichever alternative is chosen by the suspect, the net effect . . . will be the functional equivalent of an incriminating admission.' Steps eight and nine are taking the suspect's oral statement and converting it to a written confession." (*Mourning Miranda, supra,* 96 Cal. L.Rev. at pp. 1532-1533, fns. omitted.)

Although the Reid textbook states that "the purpose of an interrogation is to learn the truth,"[9] it makes clear that an interrogation should not be undertaken until *after* investigation points to the suspect's likely guilt. The text emphasizes, "*An interrogation is conducted only when the investigator is reasonably certain of the suspect's guilt*. The investigator should have some basis for believing a suspect has not told the truth before confronting the suspect. The basis for the belief may be the suspect's behavior during an interview or inconsistencies within the suspect's account, physical evidence, or circumstantial evidence, coupled with behavioral observations. Interrogations should not be used as a primary means to evaluate a suspect's truthfulness; in most cases, that can be accomplished during a nonaccusatory interview." (Inbau et al., Criminal Interrogation, *supra*, at pp. 5-6.)

Referring to the Reid text and other manuals that document interrogative procedures employed with success by law enforcement agencies, *Miranda* emphasized that "the 'principal psychological factor contributing to a successful interrogation is *privacy*' " and that " 'the interrogation should take place in the investigator's office or at least in a room of his choice.' " (*Miranda, supra,* 384 U.S. at p. 449.) A subject should not be interrogated in his own home, the manuals say, because there the subject is more likely to be " 'confident, indignant, or recalcitrant' "; and he "is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. (*Id*. at pp. 449-450.) In a private place of his own choosing, "the investigator possesses all the advantages." (*Id*. at p. 450.)

---

[9] In response to the view of most behavioral scientists who study the subject that the purpose of interrogation is to induce confessions, the Reid text states: "A common misperception exists in believing that the purpose of an interrogation is to elicit a confession. Unfortunately, there are occasions when an innocent suspect is interrogated, and only after the suspect has been accused of committing the crime will his or her innocence become apparent. If the suspect can be eliminated based on his or her behavior or explanations offered during an interrogation, the interrogation must be considered successful because the truth was learned. Oftentimes an interrogation also will result in a confession, which again accomplishes the goal of learning the truth." (Inbau et al., Criminal Interrogation, *supra*, at p. 5.)

Detective Buchignani knew where Elias lived and agreed she could have spoken with him at his home, where at least one of his parents was likely to be present. She interrogated Elias at the school because she knew he would be there, knew the principal and had previously met with juveniles there, and "had time to take care of the case that day." Elias was brought by the principal, the highest authority at the school, to a small room that normally accommodated two people, contained a single desk and three chairs, and "may" have had windows. Buchignani directed Elias to sit across from her and next to the principal; Sergeant Martinez stood behind Elias, and a third officer, a uniformed deputy, stood outside the door. As the Supreme Court has indicated, the mere fact of police questioning of a minor in the school-house setting may have a coercive effect, because the child's "presence at school is compulsory and [his] disobedience at school is cause for disciplinary action." (*J.D.B., supra*, ___U.S. at p.___ [131 S.Ct. at p. 2405]; see, *Commonwealth v. Bell* (Ky. 2012) 365 S.W.3d 216, 224-225; *No Match, supra,* 38 Hastings Const. L.Q. at p. 1073.)

Like all contemporary police manuals on interrogation, those quoted in *Miranda* instruct that, in order "[t]o highlight the isolation and unfamiliar surroundings" in which the interrogation takes place, the police should "display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details. The guilt of the suspect is to be posited as a fact. The interrogator should direct his comments towards the reasons why the subject committed the act, rather than court failure by asking the subject whether he did it. Like other men, perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women. The officers are instructed to minimize the moral seriousness of the offense, to cast blame on the victim or on society. These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged." (*Miranda, supra*, 348 U.S. at p. 450, fns. omitted.)

The texts relied upon in *Miranda* also stressed the interrogator's need for patience and perseverance, not just kindness and stratagems, because the investigator will

14

" 'encounter many situations where the sheer weight of his personality will be the deciding factor.  Where emotional appeals and tricks are employed to no avail, he must rely on an oppressive atmosphere of dogged persistence.  He must interrogate steadily and without relent, leaving the subject with no prospect of surcease.  He must dominate his subject and overwhelm him with his inexorable will to obtain the truth.  He should interrogate for a spell of several hours pausing only for the subject's necessities in acknowledgment of the need to avoid a charge of duress that can be technically substantiated.' " (*Miranda, supra,* 384 U.S. at p. 451, fn. omitted.)

Conforming to most of these directives, Detective Buchignani posited Elias's guilt quickly and dispositively.  Brushing off his repeated denials of her accusations, Buchignani told Elias he was "obviously nervous because you're not telling me the truth about what happened."  Early in the interrogation Buchignani confidently declared that Elias's improper touching of A.T. "did happen" because A.T. "explained it perfectly."  Ignoring Elias's exculpatory or innocuous answers to questions regarding A.T.'s age, her brother, and exactly where Elias and A.T. were located on the bed, as well as his explanation that he simply unzipped A.T.'s pants when she asked him to because she wanted to change her clothes, Buchignani repeatedly referred to Elias's guilt as an established fact and displayed interest only in confirming details, such as why and how Elias committed the act, and never allowing the possibility he may not have committed any unlawful act.

Building on Elias's statement that, while sitting on the edge of a bed playing a competitive video game with her brother, he turned "real fast" to help A.T. "unzip her pants cause she wanted to change,"[10] and his acknowledgment that this involved touching "the outside of her," Detective Buchignani's questions, all insinuating Elias had improperly touched A.T.'s genitals, were relentless:  "when her mom walked in, how come [A.T.'s] pants were down?"; "how come you ended up on the bed with her?"; "But her mom walked in and you were on the bed with her"; "how many fingers did you put inside her?"; "you touched the outside of her but you did not put fingers inside her?";

---

[10] Elias's statement to Buchignani in this respect differs from Aurora's testimony that he told her A.T. asked him to unzip her pants so she could go to the bathroom.

"you touched the outside of her"; "You were on the bed and you had her pants down. So the question again is how many fingers did you put inside of her?"; "So, you touched the outside of her?"; "You just touched the outside of her?"; "Okay, how long did you touch her?"; "So, your hand touched her bare vagina"; "So, I know that you touched her bare vagina and you know that you touched her bare vagina"; "But you put your fingers in her bare vagina"; "You're okay with what you did?"; "You touched her"; "Why do you think you touched her"; "so you felt like you needed to touch her vagina when you were unzipping her pants?"; "Why were you kissing her before that whole incident?"; "How long have you been attracted to [A.T.]?"; "How long have you known that you have an attraction to her?"; "Why would you want to touch her?"; "You put your hand on her vagina?"; "What happens when we bring your sister in for an interview . . . and ask her what you do with her?"

The aggressive nature and persistence of Buchignani's questioning was part of an overall approach referred to in the literature on interrogation as "maximization/ minimization," a "cluster of tactics" designed to convey two things. The first is "the interrogator's rock-solid belief that the suspect is guilty and that all denials will fail. Such tactics include making an accusation, overriding objections, and citing evidence, real or manufactured, to shift the suspects mental state from confidence to hopelessness. . . . In contrast, minimization tactics are to provide the suspect with moral justification and face saving excuses for having committed the crime in question," a tactic that "communicates by implication that leniency in punishment is forthcoming upon confession." (*Police-Induced Confessions, supra,* 34 Law & Human Behav. at p. 12.) A convincing body of evidence demonstrates that implicit promises can put vulnerable innocents at risk to confess by encouraging them to think that the only way to lessen or escape punishment is compliance with the interrogator's demand for confession, especially when minimization is used on suspects who are also led to believe that their continued denial is futile and prosecution inevitable. (*Decision to Confess Falsely*, *supra*, 74 Denver U. L.Rev. 979; Gudjonsson, The Psychology of Interrogations, Confessions And Testimony (1992); Kassin & McCall, *Police Interrogations and Confessions: Communicating Promises and Threats by Pragmatic Implication* (1991) 15

16

Law & Human Behav. 233; Kassin & Keichel, *The Social Psychology of False Confessions* (1996) 7 Psych. 125; *Police-Induced Confessions*, at p. 12.)

The maximization tactics Buchignani employed during her accusative questioning were deceptive in a variety of ways, including the use of false evidence. She told Elias the improper touching had happened because A.T. had "explained it perfectly," and Aurora "walked in and saw" him touch A.T.'s vagina, though she knew that both representations were false and that neither Hector, who was present, nor anyone else, witnessed even the unzipping that Elias freely admitted.

Studies demonstrate that the use of false evidence enhances the risk of false confessions. (Kassin, *On the Psychology of Confessions: Does Innocence Put Innocents at Risk?* (2005) 60 Am. Psychologist 215, 218.) "Confronting innocent people with false evidence—laboratory reports, fingerprints or footprints, eyewitness identification, failed polygraph tests—may cause them to disbelieve their own innocence or to confess falsely because they believe that police possess overwhelming evidence. Innocent suspects may succumb to despair and confess to escape the rigors of interrogation in the naïve belief that later investigation will establish their innocence rather than seek to confirm their guilt." (Feld, *Police Interrogation of Juveniles: An Empirical Study of Policy and Practice* (2006) 97 J. Crim. Law & Criminology 219, 313, fns. omitted (*Police Interrogation of Juveniles*).)

False evidence, the use of which is forbidden in Great Britain and many European nations (*Police-Induced Confessions, supra,* 34 Law & Human Behav. at p. 17; Slobogin, *An Empirically Based Comparison of American and European Regulatory Approaches to Police Investigation* (2001) 22 Mich. J. Int'l. L. 423, 443-444), was used in many cases in this country in which defendants subsequently exonerated by DNA evidence were wrongfully convicted based upon confessions. (*Police-Induced Confessions,* at p. 17; *False Confessions, supra,* 82 N.C.L.Rev. at p. 904) In the United States, although deceptive interrogation techniques do not necessarily invalidate incriminating statements (*Frazier v. Cupp* (1969) 394 U.S. 731, 739; *People v. Smith* (2007) 40 Cal.4th 483, 505), they are relevant in considering the totality of the circumstances (*Frazier*, at p. 739) as "a factor which weighs against a finding of voluntariness [citations]." (*People v. Hogan*

17

(1982) 31 Cal.3d 815, 840-841, overruled on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

Buchignani's threat to subject Elias against his will to a lie detector test that would definitively reveal the falsity of his denials—referred to in the literature as "the lie detector ploy"—is among the most common interrogation techniques that result in false confessions. (See, e.g., Lykken, A Tremor in the Blood: Uses and Abuses of the Lie Detector (1981); *The Decision to Confess Falsely, supra*, 74 Denver Univ. L.Rev. at pp. 1036-1041.)

Toward the end of her interrogation Detective Buchignani shifted tactics from maximization to minimization, and it was clearly this strategy that finally induced Elias to make his inculpatory statements. Buchignani offered Elias two possible explanations for the sexual touching she asserted as fact, both of which she told him were completely "understandable": that he acted on the basis of a natural "curiosity," and that the act was one any normal person in his shoes would find "exciting." As will be seen, offended by the suggestion he was "excited," Elias agreed to the more acceptable alternative that he was merely "curious," thereby admitting the felonious act. After Buchignani told Elias a lie detector "would come back deceptive because you're lying," insisted "[w]hy don't we just get this over with and get this out there so we can get you the help you need," and told Elias that "[y]our fingers touched [the] skin of her vagina," Elias allowed, "Well, I didn't like put my whole hand in there." The remainder of the interrogation went this way:[11]

"O: Okay, fair enough. So, I'm feeling pretty comfortable that you did not use your fingers to penetrate her vagina but I know that you touched her vagina with your hands, with your fingers. Okay? Why did you feel you wanted to do that? What did it feel like, was it exciting? Was it, what was it? People your age are curious that just happens sometimes. I understand that. Your body's changing and things are happening to you. If you found it exciting then . . . .

"EV: I didn't find it exciting, and after that I found it was nasty.

---

[11] "EV" is Elias V., "O" is Detective Buchignani.

18

"O: Okay. So after you touched her bare vagina with your fingers, you thought it was nasty?

"EV: Yeah, like when I was smaller, my friend one time showed me her vagina and I thought it was disgusting.

"O: Okay. So were you just curious when you touched her this time?

"EV: Curious, well I've been curious about things.

"O: Fair enough. Did you find it a little exciting?

"EV: I think it's disgusting.

"O: But you did it so there must be something there. There must be some reason why you did it. You know, this happens sometimes. There's a driving force that you need to deal with so the fact that you did it tells me that you found it exciting.

"EV: I'm serious, I'm dead serious, I don't find it exciting. I think it's like kinda gross.

"O: But you did it.

"EV: For curiosity.

"O: How long do you think you touched her?

"EV: Well, I only touched her for like around 3 or 4 seconds because I was in the middle of a game."

By offering Elias alternative explanations for improperly touching A.T.—because he "found it exciting" or "out of curiosity"—Detective Buchignani employed a so-called "false choice" strategy. As stated in the Reid text, "[w]hen the investigator presents the alternative question to the suspect, it is not enough simply to ask the question and then wait for the suspect to answer. The investigator must encourage the suspect to select one of the two options. This is accomplished through the use of positive and negative 'supporting statements.' [¶] *A positive supporting statement* is one in which the investigator reinforces the belief that the correct choice is the one that seems to be morally excusable or at least one that represents a less socially revolting reason for committing the act. The investigator should state that if the positive alternative is true, it is something he can understand." (Inbau et al., Criminal Interrogation, *supra*, at pp. 298-299.)

19

After Elias admitted he touched A.T. out of curiosity for 3 or 4 seconds, Detective Buchignani told him he was describing a three-year-old "being a little flirtatious," which was blaming her for something she was not capable of doing at that age, and pressed the point that Elias was "attracted to her . . . . Like attracted enough to touch her." Getting nowhere with suggestions that Elias was sexually excited by A.T., Buchignani began to ask about Elias's relationship with his sister. Elias denied any impropriety, adding, "I'm barely home. I'm always here playing basketball, the Teens Club, or . . . doing something like active, cause I'm an active person, I love sports." At that point Elias appears to have begun sobbing, Detective Buchignani inquired whether he needed help, Elias responded "unintelligibly," and Buchignani said that Elias's father was on his way and she was "going to talk to him and explain the situation," then take Elias into custody at the Juvenile Hall.

Detective Buchignani's accusatory interrogation was dominating, unyielding, and intimidating. We need not decide, however, whether this alone would suffice to undermine the voluntariness of Elias's statements. Our finding that Elias's statements were involuntary is based on a combination of factors: (1) Elias's youth, which rendered him " 'most susceptible to influence' [(*Eddings v. Oklahoma* (1982) 455 U.S. 104, 115)], and 'outside pressures' [(*Roper v. Simmons* (2005) 543 U.S. 551, 569).]" (*J.D.B., supra,* ___ U.S. at p. ___ [131 S.Ct. at p. 2405]; (2) the absence of any evidence corroborating Elias's inculpatory statements and (3) the likelihood that Buchignani's use of deception and overbearing tactics would induce involuntary and untrustworthy incriminating admissions.

## A.

Chief Justice Warren's analysis in *Miranda* pertains to the psychological techniques involved in the "active persuasion" commonly employed in the custodial interrogation of *adults*. There appears to be a growing consensus—among the supporters of those techniques, not just the critics—about the need for extreme caution in applying them to juveniles.

As noted at the outset of our analysis, since *Miranda* courts have expressed growing concern that the pressures of custodial interrogation " 'can induce a

20

frighteningly high percentage of people to confess to crimes they never committed' " (*Corley v. United States, supra*, 556 U.S. at pp. 320-321), and this concern is deepest in cases involving the custodial interrogation of juveniles. As recently stated in *J.D.B., supra,* ___U.S. at p.___ [131 S.Ct. at p. 2403] "[a] child's age is far 'more than a chronological fact.' [Citations.] It is a fact that 'generates commonsense conclusions about behavior and perception.' [Citation.] Such conclusions apply broadly to children as a class. And, they are self-evident to anyone who was a child once himself, including any police officer or judge. [¶] Time and again, this Court has drawn these commonsense conclusions for itself. We have observed that children 'generally are less mature and responsible than adults,' [citations]; that they 'often lack the experience, perspective and judgment to recognize and avoid choices that could be detrimental to them,' [citation]; that they 'are more vulnerable or susceptible to . . . outside pressures' than adults [citations]; and so on. Addressing the specific context of police interrogation, we have observed that events that 'would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.' [Citations.] Describing no one child in particular, these observations restate what 'any parent knows'—indeed, what any person knows—about children generally. [Citation.]" (*Ibid.*; see also *Gallegos v. Colorado* (1962) 370 U.S. 49, 53 [" '[a]ge 15 is a tender and difficult age for a boy . . . . He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces' "].)

Increasing awareness of the important differences between juveniles and adults in a variety of contexts (see, e.g., *Roper v. Simmons, supra,* 543 U. S. at pp. 569-570 and cases there cited), and, more specifically, the realization that children and adolescents are much more vulnerable to psychologically coercive interrogations and in other dealings with the police than resilient adults experienced with the criminal justice, is not limited to the courts; it is now far more widely shared by police manuals than when *Miranda* was decided.

Thus, for example, the most recent edition of the Reid manual on interrogations notes that although the use of deception, including the use of "fictitious evidence which

21

implicates the subject," has been upheld by the courts (see, e.g. *Frazier v. Cupp, supra,* 394 U.S. at p. 739; *People v. Smith, supra,* 40 Cal.4th at p. 505), "this technique should be avoided when interrogating a youthful suspect with low social maturity" because such suspects "may not have the fortitude or confidence to challenge such evidence and depending on the nature of the crime, may become confused as to their own possible involvement if the police tell them evidence clearly indicates they committed the crime. Factors such as the adolescent's level of social responsibility and general maturity should be considered before fictitious evidence is introduced." (Inbau et al., Criminal Interrogation*, supra*, at p. 255.)

The developing consensus about the dangers of interrogation has resulted from the growing number of studies showing that the risk interrogation will produce a false confession is significantly greater for juveniles than for adults; indeed, juveniles usually account for one-third of proven false confession cases. (See, e.g., *Susceptibility of Juveniles*, *supra,* 62 Rutgers L.Rev. at p. 952; *Police Interrogation of Juveniles, supra*, 97 J. Crim. L. & Criminology 219*, False Confessions, supra*, 82 N.C.L.Rev. at p. 944; Gross et al., *Exonerations in the United States, 1989 through 2003*, 95 J. Crim. L. & Criminology 523, 545; Redlich & Kassin, *Police Interrogation and False Confessions: The Inherent Risk of Youth*, *in Children as Victims, Witnesses, and Offenders: Psychological Science and the Law* (2009) 275-276.

A 2007 study of 332 law enforcement officers showed that, despite police acknowledgment of the fallibility of deception detection and differences in typical behaviors of children and youth in comparison to adults, an average of 83.2 percent of police claimed to use body language to detect deception, without discrimination of the age of the subject. (Meyer & Reppucci, *Police Practices and Perceptions Regarding Juvenile Interrogation and Interrogative Suggestibility*, 25 Behavioral Sciences & the Law 757.) As the authors of the study point out, "[t]his is especially dangerous because police are trained to view behaviors such as slouching and lack of eye contact as signals of deception and indications that they should proceed with interrogations. If police perceive these typical juvenile behaviors as deceptive, this perception may increase the frequency with which they judge young suspects to be guilty, therefore increasing the

22

frequency with which they subject youth to coercive and deceptive interrogation to obtain a confession."[12] (*Id*. at pp. 774-775.) The study concludes that "police acknowledge some developmental age differences concerning comprehension abilities, but fail to apply this knowledge to the interrogation context." (*Id*. at p. 774.) One of the findings of the study particularly pertinent to this case is that "a fair number of police (21.4%) endorsed usage of verbally tricky, forced choice questions where either choice incriminates the subject, without discrimination of the age of the suspect, indicating little knowledge or application [and knowledge of factual findings] that children are likely to choose between the forced-choice answers presented by the police even when none are correct." (*Ibid*.)

Contrary to the trial court's apparent view that Detective Buchignani did not utilize this technique,[13] her repetitive queries whether Elias touched A.T. "out of curiosity" or because it was "exciting" were precisely the sort of forced-choice question that can easily induce an adolescent such as Elias to falsely incriminate himself when confronted with false evidence of his guilt.

In a case with some striking similarities to the one before us—not least the apparent use of interrogation techniques drawing on the Reid methodology—a Kentucky court emphasized the significance of the 13-year-old suspect's age in evaluating the effect on him of various aspects of the questioning. (*Commonwealth v. Bell, supra,* 365 S.W.3d at pp. 224-225.) Like Elias, T.C. was questioned at his middle school by two police detectives who had school officials remove the boy from class and bring him to a separate room for questioning about allegations that he had anal intercourse with his six-year-old cousin in the shower. (*Id.* at p. 219.) The detective told T.C. that "thirteen-year-old boys 'have a lot of hormones,' and sometimes get 'horny' and 'get a little bit curious,' " then asked what had happened in the shower. (*Ibid.*) As T.C. denied

---

[12] The similarity between the postures common to juveniles and those deemed by many police manuals to be indicative of deceptiveness is powerfully illustrated by a series of photographs set forth in chapter 9 of the most recent edition of the interrogation manual, entitled "Behavior Symptom Analysis" (Inbau et al., Criminal Interrogation, *supra*, at pp. 123-128, figures 9-8 through 9-13).

[13] As indicated above, the court noted that the detective's "questions weren't split where there would be two responses you'd have to use to the same single question."

improper conduct, the detective insisted he already knew what happened but wanted T.C. to be honest with him; said he had to find out whether it happened accidentally or intentionally; suggested T.C. might have been curious or might have been "messing around"; insisted he needed to know why T.C. did it; and told T.C. he had to be honest and "[w]e can be done here." (*Id.* at p. 220.)[14] Finally, the detective said, " 'you did it because you were horny, had a hard on, and you were curious. . . . Am I right?' " (*Ibid.*) T.C. replied, "yes, sir." (*Ibid.*)

Upholding the lower court's finding that the confession was involuntary, the *Bell* court noted the prosecution's argument that the detectives did not deprive T.C. of food or sleep and used a calm, conversational tone. But, the court explained: "These latter statements may serve to assure an adult, or even a mature minor, that he should feel free of coercion, that he is free to say nothing and even to leave the officers' presence any time he desires. However, we do not believe they provided that same assurance, under these circumstances, to this thirteen-year-old boy." (*Commonwealth v. Bell, supra,* 365 S.W.3d at p. 224.) "[A] school is where compliance with adult authority is required and where such compliance is compelled almost exclusively by the force of authority. Like it or not, that is the definition of coercion. . . . If he is sent to the principal's office, he is not allowed to leave until the principal says so. And if he is instructed to be alone in a room with police detectives, as T.C. was, how can we expect him to believe some other set of rules applies? Can we reasonably expect a thirteen-year-old child to perceive he

---

[14] When T.C. denied anything had happened in the shower, the detective said, " 'I know what happened in the shower. I just want you to be honest with me.' " (*Commonwealth v. Bell, supra,* 365 S.W.3d at p. 219.) The detective told T.C. that the cousin claimed "he was 'bent over and [T.C.'s] penis went in [his cousin's] butt.' " When T.C. reiterated his denial, the officer said he knew something had happened and could not leave until he knew whether it happened accidentally or intentionally. (*Ibid.*) T.C. then said his cousin was playing in the shower and fell back onto T.C., and T.C.'s penis went "around" his cousin's butt but not into it. (*Ibid.*) The detective asked if T.C. was "curious to see what it felt like" and, in response to T.C.'s denial, insisted that T.C.'s penis "went in his butt" and asked T.C. why he did it, then offered possible scenarios: " '[Y]ou did it because you were either curious or you did it because you were messing around, poking at him.' " (*Id.* at p. 220.) Questioning T.C. about why he did it, the detective said, " 'the one thing I gotta break through here is why you did it. You gotta tell me that honestly. You gotta be honest. We can be done here.' " (*Ibid.*)

has *greater* freedom while in school simply because he was read his *Miranda* rights? When the detective said, 'I really can't leave here until I find out' something, is it reasonable to believe T.C. did not feel coerced into saying *something,* whether true or not; is it reasonable that he believed *he* had the right to say nothing or to get up and leave the detective there alone? We believe not. [¶] Although the thirty-two minute interrogation may not seem excessive, the repetitive questioning amounted to coercion by importunity. T.C., alone, was ordered by school officials into a room, facing adult authority figures with considerable power, who also feigned superior knowledge ('I know what happened [and your cousin] has not lied to me about anything'), and who repeatedly demanded answers that he, if he was to be an obedient child, would have to provide. How could T.C. not perceive such a situation as subjectively coercive?" (*Id.* at p. 225, italics added, fn. omitted.) "T.C. was an impressionable youth inclined to acquiesce to coercive police tactics. . . . In sum, viewing the interrogation through the lens of this thirteen-year-old student, under these circumstances, we are persuaded the district court did not err in finding T.C.'s statements to Detective Johnson 'were not the product of [his] free choice' when given." (*Ibid.*)

At 13 years of age, Elias was a young adolescent, there is no indication in the record he was particularly sophisticated, and he had no prior confrontations with the police. Buchignani interrogated him in a small room at his school, with the school principal and a second officer present, and another officer outside the door. There is every reason to believe the aggressive, deceptive, and unduly suggestive tactics Buchignani employed would have been particularly intimidating in these circumstances.

**B.**

As we have said, aside from Elias's interrogation, the only evidence that Elias touched A.T. in an improper manner was Aurora's statement the child told her he did so and the detective's testimony that in the RCC interview A.T. said Elias "touched her" and, in the detective's opinion, pointed to the vaginal area on a doll. Aurora did not see Elias touch A.T.; nor did Hector, who was playing the video game with Elias.[15] During

---

[15] Hector testified that he was sitting on the floor and Elias on the bed; Elias stated in the interrogation that Hector was "right beside me."

25

the 17 days between the occurrence of the alleged act and Aurora's complaint to the police, A.T. must have interacted with her brother, father, uncles and other members and friends of the family frequently at the apartment, as well as residents of the apartment house, yet there is no evidence anyone other than Aurora heard the things Aurora claimed her daughter had been "telling everybody." Although A.T. was interviewed, little evidence derived from that interview was introduced. The sole evidence of the manner in which Elias allegedly touched the child came from Elias's interrogation, and no evidence corroborated his incriminating statements.

The best form of corroboration is the suspect's revelation of information only a guilty suspect would know. (Inbau et al., Criminal Interrogation, *supra*, at pp. 354-356.) Thus "[t]he admissions, 'I shot and killed Mr. Johnson' or 'I forced Susie Adams to have sex with me' may be elicited from a juvenile (or adult) suspect. These admissions become useful as evidence if they are corroborated by (1) information about the crime the suspect provides which was purposefully withheld from the suspect, and/or, (2) information not known by the police until after the confession which is subsequently verified." (*Id.* at p. 255.) Corroboration is "[t]he ultimate test of the trustworthiness of a confession." (*Ibid.*) A suspect saying " 'I did it' " does not provide assurance that the admission is true; "internal indicia of reliability and independent evidence" are necessary. (*Decision to Confess Falsely*, *supra*, 74 Denv. U. L.Rev. at pp. 990-991.)

As we will explain, *post,* at pages 29-30, Elias's admissions did not even amount to an "I did it." Internal indicia of reliability were absent, as Elias said nothing during his interrogation that only a guilty suspect would know. Rather, all of the differing descriptions of where and how the alleged improper touching took place were first offered by Detective Buchignani.

One of the ways police facilitate false confessions is by disclosing specific facts regarding the crime during the interrogation process, inducing the suspect to adopt these facts and thus accurately "confirm[] the preconceived story the police seek to have him describe." (*Miranda*, *supra*, 384 U.S. at p. 455; Nirider et al., *Combating Contamination in Confession Cases* (2012) 79 U. Chi. L.Rev. 837, 847 (*Combating Contamination*).) The use of this suggestive technique—referred to as "contamination" (see *Combating*

26

*Contamination*, at pp. 846-847); Garrett, *Contaminated Confessions Revisited* (2015) 101 U.Va. L.Rev. 395, has been found to be coercive and to have overcome the will of subjects, particularly those who are young or otherwise vulnerable.  (See, e.g., *United States v. Preston* (9th Cir. 2014) 751 F.3d 1008, 1023-1024 (en banc); *In re J.F.* (D.C. 2010) 987 A.2d 1168*; State v. Rettenberger* (Utah 1999) 984 P.2d 1009, 1020; *Passama v. Nevada* (Nev. 1987) 735 P.2d 321, 324.)  This is why investigators are told not to reveal to suspects all information they have about the crime:  Revelation to a suspect of known details about a crime is discouraged because it creates the possibility a confession may simply reflect suggestions made by the investigator, "not the product of spontaneous recall on the part of the suspect."  (Inbau et al., Criminal Interrogation, *supra,* at p. 359**;** see *Combating Contamination*, at p. 847.)

Contamination also "prevents police from testing and corroborating the reliability of the admissions and confessions they elicit."  (*Combating Contamination, supra,* 79 U. Chicago L.Rev. at p. 848.)  As one of the authors of Criminal Interrogation has said, "[I]t is imperative that interrogators do not reveal details of the crime so that they can use the disclosure of such information by the suspect as verification of the confession's authenticity.  In each case there should be documented 'hold back' information about the details of how the crime was committed; details from the crime scene; details about specific activities perpetrated by the offender; etc.  The goal is to match the suspect's confession against these details to establish the veracity of the statement."  (*Combating Contamination,* at pp. 847-848, quoting Joseph P. Buckley, *The Reid Technique of Interviewing and Interrogation*, in Tom Williamson ed., Investigative Interviewing: Rights, Research, Regulation 190, 204-05 (Willan 2005).)

Here, because Buchignani suggested *all* of the scenarios involving improper touching, she enhanced the likelihood that Elias's statements resulted from his suggestibility rather than recall of actual events.  Further, because there was no evidentiary basis for the suggestions, any contamination that occurred necessarily resulted in Elias's adoption of facts that were entirely speculative on Buchignani's part.  And because Buchignani had no information about the alleged offense, she had no basis for evaluating the veracity of Elias's statements.  As a result, not only are Elias's

inculpatory admissions wholly uncorroborated, they leave open the real possibility that Elias simply accepted a description of the events—that he briefly touched the bare skin of A.T.'s vagina—that was deceptively suggested by Detective Buchignani.

## C.

Use of the deceptive techniques employed by Detective Buchignani, which are essentially those critically described in *Miranda*, "is a factor which weighs against a finding of voluntariness [citations]." (*People v. Hogan, supra,* 31 Cal.3d at pp. 840-841.) And, given the vulnerabilities we have discussed, the use of deceptive techniques is significantly more indicative of involuntariness where, as here, the subject is a 13-year-old adolescent who has never previously had any confrontation with the police.

The authors of the text expounding the Reid Technique candidly admit that "[m]any of the interrogation techniques presented in this text involve duplicity and pretense. To persuade a guilty suspect to offer an admission against self-interest, the investigator may have to falsely exaggerate confidence in the suspect's guilt, sympathize with the suspect's situation, and display feelings toward the suspect or his crime that are far from genuine. The investigator may suggest a face-saving motive for the commission of the crime, knowing it is not true. In some cases an investigator may falsely imply, or outright state, that evidence exists that links the suspect to the crime." (Inbau et al., Criminal Interrogation, *supra*, at p. 351.) But, as we have said, the text makes it eminently clear that such deceptive techniques "*should be avoided when interrogating a youthful suspect with low social maturity*" because such suspects "may not have the fortitude or confidence to challenge such evidence" and "may become confused as to their own possible involvement, if the police tell them evidence clearly indicates they committed the crime." (*Id*. at p. 352, italics added.)

Indeed, our review of the interrogation leaves considerable question what Elias meant to be saying when he made the statements that incriminated him, or whether he understood their significance. As we have described, Elias repeatedly stated that all he did was help A.T. unzip her pants at her request. He "touched" her, yes—because it would be impossible to unzip her pants without touching her: "I did touch her but I never really touched her like go like that or do something to her. [¶] . . . [¶] I wasn't touching

28

her vagina." When Buchignani insisted that Elias touched the skin of A.T.'s vagina, he said he "didn't like put my whole hand in there" and, later, that his "finger like slipped, but I did touch it but I didn't put it in there and just leave it"; when asked how long he touched A.T., he said, "I only touched her for like around 3 or 4 seconds because I was in the middle of a game." These responses leave very unclear whether Elias understood himself to be acknowledging that he "touched" A.T. in the way Buchignani meant rather than that he "touched" her to unzip her pants in a few-seconds interruption of the video game he was in the midst of playing with Hector. At one point, Elias having denied finding the touching "exciting" and said "after that I thought it was nasty," Buchignani asked him, "[s]o, after you touched her bare vagina with your fingers you though[t] it was nasty?" Elias responded, "Yeah, like when I was smaller, my friend one time showed me her vagina and I thought it was disgusting." The answer is ambiguous: Perhaps Elias was referring to another time when he thought it was disgusting just like he did this time, but perhaps he was simply responding to Buchignani's questions about vaginas by relating something that had happened in the past. If Elias did not understand that his answers conveyed an admission that he touched A.T. improperly, it would make no sense to view them as voluntary and a product of his free will.

The cases respondent relies upon to argue the interrogation tactics used here were not inappropriate are distinguishable in critical ways. The only one of these cases involving a juvenile is *In re Joe R.* (1980) 27 Cal.3d 496. The minor, nearly 18 years old, denied participation in two robberies for the first 30 to 40 minutes of interrogation, then confessed after the interrogating officer accused him of lying "loudly, emphatically, and with terse language (e.g., 'bullshit')" and confronted him with incriminating evidence that had been discovered in the closet of his bedroom. (*Id.* at pp. 502-503, 515) The Supreme Court upheld the trial court's determination that the confession was voluntary, explaining that " '[m]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary' " and the trial court "had no duty to rule that loud, aggressive accusations of lying amounted to coercive threats." (*Id.* at p. 515, quoting *People v. Jimenez* (1978) 21 Cal.3d 595, 611, overruled on other grounds in

*People v. Cahill* (1993) 5 Cal.4th 478, 484, 510.) The Supreme Court also noted that the confession was not invalidated by " 'deception . . . of a type reasonably likely to procure an untrue statement.' " (*Ibid.*, quoting *In re Walker* (1974) 10 Cal.3d 764, 777.) Thus, *In re Joe R.* involved a minor significantly older than Elias, the interrogator did not use false evidence, false choice questions or other forms of deception, and the interrogation was preceded by an investigation that independently provided substantial inculpatory and corroborating evidence.

*Illinois v. Perkins* (1990) 496 U.S. 292, which respondent relies upon for the point that police use of deception is not necessarily coercive, involved neither a juvenile nor an interrogation: The defendant's statements were made to an undercover agent posing as a fellow jail inmate. The court held that the premise of *Miranda* was "that the danger of coercion results from the interaction of custody and official interrogation" and "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone [whom] he believes to be a fellow inmate." (*Illinois*, at pp. 296-297.)

Respondent's other authorities state the proposition that misrepresentation by the police does not *necessarily* invalidate a confession. (*Amaya-Ruiz v. Stewart* (9th Cir. 1997) 121 F.3d 486 [misrepresentation inflated extent of witness evidence], overruled on other grounds in *United States v. Preston*, *supra*, 751 F.3d at pp. 1019-1020; *Pollard v. Galaza* (9th Cir. 2002) 290 F.3d 1030, 1034 [no misrepresentation]; *People v. Maury* (2003) 30 Cal.4th 342, 411 [defendant recognized ruse employed by Department of Corrections psychologist and refused to succumb to deception]; *People v. Jones* (1998) 17 Cal.4th 279, 299 [detective implied he knew more than he did or could prove more than he could].) As none of these cases involve juveniles or are otherwise factually similar to the present case, none are helpful in evaluating the effect of the use of false evidence here.

"[R]esearch on juveniles' ability to exercise *Miranda* rights and their adjudicative competence consistently reports that, as a group, adolescents understand legal proceedings and make decisions less well than do adults. Youths fifteen years of age and younger exhibited the clearest and greatest disability." (*Police Interrogation of*

30

*Juveniles*, *supra*, 97 J. Crim. L. & Criminology at p. 233; Grisso, Juveniles' Waivers of Rights; Legal and Psychological Competence (1980); Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis* (1980) 68 Cal. L.Rev. 1134.) "Social expectations of obedience to authority and children's lower social status make them more vulnerable than adults during interrogation. Less powerful people, such as juveniles or racial minorities, often speak indirectly with authority figures to avoid provoking conflict. Juveniles may acquiesce more readily to police suggestions during questioning." (*Police Interrogation of Juveniles,* at p. 230, fns. omitted; Ferguson & Douglas, *A Study of Juvenile Waiver* (1970) 7 San Diego L.Rev. 39; Grisso & Pomiciter, *Interrogation of Juveniles: An Empirical Study of Procedures, Safeguards, and Rights Waiver* (1977) 1 Law & Hum. Behav. 321; Drizin & Colgan, *Tales From the Juvenile Confession Front: A Guide to How Standard Police Interrogation Tactics Can Produce Coerced and False Confessions from Juvenile Suspects*, *in Interrogations, Confessions, and Entrapment* (Lassiter ed., 2004) 153-155.) Given their vulnerabilities to interrogation, the inordinate number of false confessions given by juveniles should come as no surprise.

The false evidence and other deceptive techniques employed in this case to induce a 13-year-old adolescent to incriminate himself create substantial doubt about both the voluntariness of Elias's inculpatory statements and the truth of those statements—even though Elias need not show they were not trustworthy. (*Rogers v. Richmond, supra*, 365 U.S. at pp. 543-544). These doubts must be resolved adversely to the prosecution due to both the absence of any evidence corroborating the truth of Elias's incriminating statements, which we have discussed, and the presence of evidence suggesting they may be false. As we have explained, the record provides significant reason to think Aurora's claims may have been motivated by a desire to retaliate against Elias's father for complaining to the landlord and the police about her family.

Additionally, although we do not assign it great weight, we are troubled by the fact that, almost immediately after the trial court's jurisdictional ruling against him, Elias told a probation officer that he did not commit the adjudicated offense but "only tried to help the young girl." As noted in the Reid text, "[a]s soon as the threat of the interrogation has

31

been removed, it would be expected that the innocent suspect would denounce the confession and protest innocence to anyone willing to listen." (Inbau et al., Criminal Interrogation, *supra*, at p. 357.)

In finding Elias's statements voluntary and admissible, the trial court stated that Detective Buchignani's manner was "gentle" and "calm," her questions were "not convoluted," her language was age appropriate, and "the questions weren't split where there would be two responses you'd have to use the same single question." As we have explained, the court's last point, that Buchignani did not employ a "false choice strategy," was clearly mistaken. But this inattention, and the superficiality of all of the other factors the trial court also relied upon, demonstrate the need for much more rigorous judicial scrutiny of voluntariness of statements made under the "inherently compelling pressures" of the forms of custodial interrogation now in common use by law enforcement agencies. Many who study the subject closely think post-*Miranda* police practices "have gutted *Miranda's* safeguards" so that today, "*Miranda*'s protections are more mythic than real." (See, e.g., *Mourning Miranda*, *supra*, 96 Cal. L.Rev. at p. 1599; Kamisar, *On the Fortieth Anniversary of the Miranda Case: Why We Needed It, How We Got It – And What Happened to It* (2007) 5 Ohio St. J. of Crim. L. 163; White, *False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions* (1997) 32 Harv. C.R.-C.L. L.Rev. 105.) Increasingly, the survival of those protections, and the vindication of the *Miranda* court's concern about the increasing number of false confessions, which is of particular concern with adolescent suspects, may depend upon the willingness of trial judges to engage in vigorous individual assessment of the voluntariness of a statement despite the suspect's *Miranda* waiver. As Justice Souter has remarked, "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." (*Missouri v. Seibert* (2004) 542 U.S. 600, 608-609 (plur. opn.).) The fact of a *Miranda* waiver should not be allowed to serve as an obstacle to the vital assessment of voluntariness. (Garcia, *Is Miranda Dead, Was it Overruled or Is It Irrelevant?* (1998) 10 St. Thomas L.Rev. 461, 496-502.)

32

In the present case, considering the totality of the circumstances and the vulnerabilities and susceptibility of adolescents subjected to custodial interrogation that have been emphasized by the Supreme Court (*J.D.B., supra,* ___U.S. at p. ___ [131 S.Ct. at p. 2403], and cases there cited), we have little difficulty concluding that the inculpatory statements made by Elias to Detective Buchignani cannot be deemed a product of his free will.

## D.

Although it may not bear directly on the voluntariness of Elias's statements, one of the most remarkable features of the present case is that before interrogating Elias, Detective Buchignani had neither interviewed him or anyone else about this case nor investigated or questioned the truth of Aurora's statement to Officer Chavez that she "believed" Elias "had assaulted her daughter" on October 6th. This point is significant because proceeding in this manner violated a basic tenet of the Reid Technique meant to reduce the likelihood of inducing false confessions.

So far as the record shows, the only police conduct prior to the interrogation that could be described as investigatory was the short statement Officer Chavez took from Aurora, and the apparently uninformative interview of A.T. Aurora did not tell Chavez she saw Elias touch A.T., and she said her 8-year-old son Hector had told her he "didn't witness anything." The trained expert who interviewed A.T. never testified and the tape of the interview was never introduced in evidence, as it surely would have been if A.T.'s statements or behavior had corroborated Aurora's statements to the police. There was only Buchignani's testimony that A.T. gave "enough information to believe she had been touched" by, as it appeared to Buchignani, pointing to the vaginal area on a doll. Buchignani confirmed at the jurisdictional hearing that she had never spoken with Elias prior to interrogating him and had never previously spoken with anyone else in Elias's or A.T.'s family, the landlord, any tenant of the apartment house, any student or teacher or other authority at Elias's school, or anyone else who might shed light on the case. As Buchignani testified, her agency "didn't make contact with anyone other than [Aurora]."

As we have said, it is accepted by virtually all respected authorities on custodial interrogation that aggressive interrogation designed to overwhelm the subject with the

33

interrogator's indomitable will to obtain the truth is a technique that should *only* be used *after* an investigation has indicated that " 'the guilt of the subject appears highly probable.' " (*Miranda, supra,* 384 U.S. at p. 451, fn. omitted.)  The significance of this principle arises from the distinctive characteristics of an *interrogation* that differentiate it from an ordinary investigative *interview*.

As underscored in the opening pages of the current edition of the text expounding the Reid Technique, an "interview" is "nonaccusatory," its purpose "is to gather information," "it may be conducted early in an investigation," "it may be conducted in a variety of environments," the conversation should be "free flowing and relatively unstructured," and "the investigator should take written notes."  (Inbau et al., Criminal Interrogation, *supra*, at pp. 3-4.)  On the other hand, an "interrogation" is "accusatory" and "involves active persuasion," it "is conducted in a controlled environment" and "*only when the investigator is reasonably certain of the suspect's guilt*," and the investigator "should not take any notes until after the suspect has told the truth and is fully committed to that position."  (*Id.* at pp. 5-6, italics added.)

Proponents of the Reid Technique, and virtually all interrogation manuals, counsel that interrogation should almost never be undertaken without the benefit of a previous interview:  "Absent a life-saving circumstance the investigator should conduct a non-accusatory interview before engaging in any interrogation.  During the interview the investigator can establish rapport with the suspect, assess their credibility, develop investigative information and establish a behavioral baseline.  Also, during the interview the suspect is more likely to reveal information that can be used to develop an interrogation strategy."[16]

While Aurora's report of what her three-year-old daughter told her undoubtedly warranted investigation, including an *interview* of Elias, Detective Buchignani moved too quickly to *interrogate* him in a manner unjustified even by the standards of the Reid Technique itself.  "The message of interrogation in the pre-admission phase is that the

---

[16] The Reid Technique of Interviewing and Interrogation-Position Paper, available at <http://www.reid.com/pdsf/reid_position_paper.pdf> (as of June 1, 2015); see Inbau et al., Criminal Interrogation, *supra*, at pp. 6-7.)

evidence already in hand leads to the conclusion that the suspect's factual guilt has been established beyond any doubt.  Although sometimes it is possible to be entirely truthful when making this claim, it is permissible for the claim to be a complete lie.  By forcefully presenting a claim that he knows is entirely fabricated to someone he guesses is guilty, the investigator hopes to create the impression of an airtight case and convince the suspect that resistance is futile.  When real evidence is lacking the investigator knows full well that it is only by getting the suspect to give a full and detailed confession that he will be able to find the evidence that will prove correct his speculative, intuitive, and risky guess." (*The Decision to Confess Falsely*, *supra*, 74 Denver Univ. L.Rev. at p. 1008, fns. omitted.)

Against the advice of all police manuals and other authorities, Detective Buchignani used custodial interrogation as not just the primary but the only means of evaluating Elias's truthfulness.  As noted by a prominent student of custodial interrogation, innocent people falsely accused often believe in "a just world and in the transparency of their own blameless status . . . .  [T]hose who stand falsely accused also have faith that their innocence will become self-evident to others.  As a result they cooperate with police, often not realizing that they are suspects, not witnesses; they waive their rights to silence, counsel, and a lineup; they agree to take lie-detector tests; they vehemently protest their innocence, unwittingly triggering aggressive interrogation behavior; and they succumb to pressures to confess when isolated, trapped by false evidence, and offered hope via minimization and the leniency it implies.  *Yet without independent exculpatory evidence, their innocence is not easily detected by othe*rs." (*On the Psychology of Confessions, supra*, 60 Am. Psychologist at p. 224, italics added.)  The "lesson of history," our Supreme Court has observed, is "that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." (*Escobedo v. Illinois* (1964) 378 U.S. 478, 489-490, fns. omitted.)

The voluntariness of inculpatory statements made during an interrogation conducted on the basis of no more than the interrogator's "speculative, intuitive, and

risky guess" that the subject is guilty warrants particularly careful judicial scrutiny. A confession resulting from an interrogation undertaken in the absence of evidence strongly indicative of guilt is not necessarily inadmissible, but it is a circumstance to be carefully considered in evaluating the voluntariness of the resulting confession. And, of course, strict scrutiny of uncorroborated confessions elicited during such interrogations may also have the salutary effect of discouraging an unprofessional and hazardous police practice.

## E.

We conclude that the prosecution failed to prove by a preponderance of the evidence that Elias's inculpatory statements were voluntary, and the trial court therefore erred in receiving the statements in evidence. Because the jurisdictional ruling was based almost entirely on those statements, the error was prejudicial. Accordingly, the judgment must be and is reversed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


| | |
|---|---|
| Trial Court: | Sonoma County Superior Court |
| Trial Judge: | Hon. Raima Ballinger |
| Attorneys for Defendant and Appellant: | Under appointment by the First District Court of Appeal<br>L. Richard Braucher |
| Attorneys for Amicus Curiae on behalf of Defendant and Appellant: | Center on Wrongful Convictions of Youth<br>Megan G. Crane<br>Joshua A. Tepfer |
| Attorneys for Plaintiff and Respondent: | Attorney General of California<br>Kamala D. Harris<br><br>Gerald A. Engler<br>Senior Assistant Attorney General<br><br>Eric D. Share<br>Supervising Deputy Attorney General<br><br>Sharon G. Birenbaum<br>Deputy Attorney General |