Filed 12/2/20  P. v. Avalos CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

JORGE ARMANDO AVALOS,

    Defendant and Appellant.

E072862

(Super.Ct.No. RIF1704003)

OPINION

APPEAL from the Superior Court of Riverside County.  Timothy J. Hollenhorst, Judge.  Affirmed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison Acosta and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jorge Armando Avalos first met 23-year-old Jane Doe, who was his stepmother's niece, at a family party.  The following day, the family went

1

together to brunch, where Doe drank Mimosas and, when leaving the restaurant, appeared to be intoxicated. Defendant invited Doe and the rest of the family back to his apartment complex to swim at his pool. Doe felt sick and she was helped to his apartment where she fell asleep on his bed. She woke up to defendant having sexual intercourse with her, he inserted his finger into her vagina, and he orally copulated her. Defendant was interviewed by police and admitted to having sex with Doe, and that she may have been too intoxicated to consent.

Defendant was found guilty of having sexual intercourse with an intoxicated victim (Pen. Code, § 261, subd. (a)(3))[1]; sexual penetration with a foreign object of an intoxicated victim (§ 289, subd. (e)); and committing an act of oral copulation on a person unable to resist due to an intoxicating substance (§ 287, subd. (i)).[2] Defendant was sentenced to 14 years to be served in state prison.[3]

Defendant makes one claim on appeal that his statement to police was obtained through coercion and implied promises of leniency in violation of his Fifth and Fourteenth Amendment rights under the United States Constitution, which rendered his confession involuntary. The People claim that the trial court did not have the authority to stay the restitution fine and assessments imposed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was also charged with sexual penetration by means of force or violence (§ 289, subd. (a)(1)(A)), but he was found not guilty of the charge.

[3] The trial court also imposed fines and fees that it stayed based on his inability to pay, which we will discuss further, *post*.

2

# FACTUAL HISTORY

A.   PEOPLE'S CASE IN CHIEF

1.   *DOE'S FAMILY MEMBERS*

Luz Loza was married to defendant's father, Jorge Avalos, Sr. (Jorge Sr.). Loza had two daughters, Tanya and Naomy Godoy. In August 2017, Tanya[4] was dating Isaias Avalos, defendant's brother and Jorge Sr.'s son, and they had a child together. Jane Doe was Loza's niece. On August 26, 2017, Loza, Jorge Sr., Isaias, Tanya, Naomy and Doe spent the day at Lake Perris. Defendant met them at the lake. Loza did not see any interaction between Doe and defendant at the lake.

On August 27, 2017, Loza, Jorge Sr., defendant, defendant's girlfriend Evelyn, Isaias, Tanya (and her daughter), Naomy, Doe (and her son), and Doe's sister Darlene all went to an El Torito restaurant for brunch. Most of the adults were drinking all-you-can-drink Mimosas. They were at the restaurant for several hours.

Doe and defendant were sitting across from each other at the table. Defendant appeared to be interested in Doe even though he was sitting next to Evelyn. Loza observed that as the day progressed, Doe appeared drunk. Defendant got into an argument with Evelyn and she left as they were all leaving the restaurant.

When they decided to leave the restaurant, defendant invited them back to his apartment because his apartment complex had a pool. As they were leaving, Tanya

---

[4] We refer to some of the witnesses by their first names or initials for clarity due to shared last names. No disrespect is intended.

3

observed that Doe had trouble walking and appeared to be drunk. Loza had to help Doe to the car. Doe had not expressed to Tanya that she had an interest in defendant.

Jorge Sr. drove Doe to defendant's apartment along with Naomy, Darlene, and Doe's son. The rest of the family drove in two other vehicles. On the way to defendant's apartment, Jorge Sr. had to stop three times because Doe had to vomit. She vomited again in the parking lot at defendant's apartment complex. Naomy indicated that Doe appeared a "little bit" drunk. Loza observed that Doe was drunk. Loza and Tanya walked Doe to the couch in defendant's apartment.

Doe vomited into the kitchen sink and defendant was present standing behind her. Naomy observed while Doe and defendant were at the sink, defendant moved his hand down Doe's buttocks and pinched her buttocks. Loza saw defendant holding Doe at her waist. Loza took Doe to the couch. Doe had a hard time walking and was slurring her words. Doe was unable to sit upright on the couch.

Defendant allowed Doe to lay down in his bedroom. Loza and Tanya laid Doe down on the bed. Doe went to sleep. Naomy noted that Doe appeared to be drunk. Defendant encouraged everyone to go to the pool.

Everyone went to the pool except for Isaias and Tanya, who stayed in defendant's apartment to watch over Doe. Defendant also stayed in the apartment. Defendant told Tanya and Isaias that he wanted to "get at" Doe. Tanya told him Doe had a boyfriend.

Defendant left the apartment telling Isaias, Naomy and Tanya he was going to get pizza for the children. They observed him walk down the stairs to the parking lot. Tanya

4

wanted to check on her daughter at the pool so she and Isaias left the apartment and went to the pool. It was a two-minute walk to the pool.

Naomy decided to return to defendant's apartment to stay with Doe. Darlene came with Naomy and sat on the couch. Naomy thought Doe was alone in the apartment and defendant was out getting food. The door to the bedroom was open when Naomy returned from the pool. Naomy looked into the bedroom to check on Doe, and defendant was in the room with his shorts down. He pulled up his shorts when he saw Naomy. Doe was on the bed and her legs were hanging over the edge. Doe appeared to be unconscious. Defendant said, "Oops." Doe did not see defendant having sexual intercourse with Doe.

Naomy went back to the pool. She whispered in Tanya's ear that she had found defendant in the apartment with his pants down. Tanya told Loza. Tanya, Loza, Naomy and Jorge Sr. ran back to the apartment. Doe was on the bed with her feet hanging off the bed. She did not want them to touch her. Doe appeared to be still drunk and was upset. Doe got into a fetal position on the bed and was agitated. Doe said that she was sorry that Naomy "had to see that." She also said that she told him "no," and that she could not get him off of her. She told them she did not want it to happen. Naomy and Tanya had seen defendant on the stairs leading to the apartment and he said, "I didn't do anything."

Doe did not want anyone to touch her and kept pushing them away. Tanya, Loza and Naomy were finally able to get her up but she stumbled and still appeared to be intoxicated. Doe was crying and shaking. Doe stumbled when they finally got her off the bed and still appeared to be intoxicated. Loza had to help Doe walk. Doe got into

5

Jorge Sr.'s car with Loza and Doe's son. Loza saw defendant at the apartment and he appeared nervous. Doe did not initially want them to call the police.

Loza and Jorge Sr. took Doe to her apartment in Anaheim. Doe's mother called the police and they went to the hospital for a sexual assault exam. Tanya and Loza went with Doe to the hospital. She was scared and shaking. Naomy also went to the hospital. Doe seemed very sad.

Tanya was upset when she first saw Doe because she was aware that defendant had previously been accused of raping a cousin. Doe also told Tanya and Naomy at the apartment that she was embarrassed and that she should not have drank. She also said she should not "have dressed this way." She also said she told defendant "no" because he had a girlfriend and that she did not want to "catch" anything.

Tanya acknowledged that after her testimony on direct, Isaias called and threatened her telling her to watch her back because she was a liar. She obtained a protective order against him. Isaias told her he had talked to defendant about her testimony.

2.    *DOE*

Doe was born in May 1993 and was 25 years old at the time of trial. Doe met defendant for the first time on August 26, 2017, while she and her family were at the lake. Doe lived in Anaheim but was staying with Loza for the weekend to celebrate her son's birthday. Doe had very little interaction with defendant on that day at the lake. Doe was seeing someone and was not attracted to defendant. She did not flirt with him.

6

The following day, on August 27, she went with the family to El Torito for brunch. Defendant met them at the restaurant. Doe drank Mimosas and ate shrimp during brunch. The waiter refilled her original glass so she was unsure how many drinks she had consumed. Defendant was drinking. Doe sat across from him and Evelyn. Evelyn and Doe talked. Doe did not flirt with defendant. She started to feel lightheaded and spilled her drink at one point. She did not recall leaving El Torito. After brunch, Loza had planned to take Doe and her son back to their home in Anaheim, but instead took her to defendant's apartment.

Doe did not recall the drive home from El Torito to defendant's apartment except for at one point sticking her head out of the car and throwing up. She recalled sitting down in defendant's living room and feeling dizzy and sick. She vomited in the kitchen sink. She then remembered laying down on defendant's bed. Doe felt drunk. She fell asleep.

Doe woke up and defendant was facing her. She was still dizzy and sick and kept closing and opening her eyes. Defendant then pushed aside the romper she was wearing and put his penis inside her vagina. Doe had not told him she wanted to have sex. She did not consent to sexual intercourse. Doe asked defendant, "Why are you doing this to me, you have a girlfriend?" Defendant whispered in her ear, "Don't worry about her. She's not my girlfriend. She's my business partner. She's my associate."

Defendant put his penis inside of her vagina two times. Defendant asked Doe to perform oral sex on him to help him get erect but she refused. Doe felt disgusted and confused; she did not want him to touch her. Defendant then performed oral sex on Doe.

7

He forced his fingers inside her vagina and then tried to insert his penis in her vagina again but he was not fully erect. It hurt when he put his fingers inside her. She did not consent to defendant performing oral sex or inserting his fingers in her. Defendant then stopped and left the room. Doe heard Naomy's voice.

Doe recalled that Loza helped her out of the bedroom to the car. Doe felt dizzy, lightheaded and still drunk. Doe kept saying that she was sorry because she felt that nothing would have happened if she had not been drinking and had worn a different outfit. She blamed herself for attracting defendant by drinking and wearing her outfit. Doe froze while the assault was happening because she felt confused and disoriented.[5]

Once they got back to Doe's house in Anaheim, the police were called. Doe admitted she did not try to stop defendant. Doe was concerned about the fact she had been drinking in the presence of her son and worried that child protective services would take her son.

Doe denied that she ever grabbed defendant's penis or kissed him. Doe denied that she told defendant that she needed satisfaction. She did not recall that she pushed his head down to her vagina while he was performing oral sex on her. Doe had trouble reasonably responding to what defendant was doing because she was intoxicated. If she had been sober, she would have tried to push him off and tell him no.

---

[5] She admitted she was still able to talk to defendant and ask him why he was doing this to her.

8

3.    *INVESTIGATION*

Doe submitted to a sexual assault examination on August 27, 2017, at around midnight.  Doe was very anxious and was crying.  She was disheveled.  Doe had abrasions around her vaginal opening.  DNA swabs were taken from the vaginal area.  There was a laceration on her perineum.  The laceration and abrasions were consistent with a sexual assault occurring.  These injuries were consistent with digital penetration.

Riverside Police Detective Paul Miranda investigated Doe's case.  He called defendant and asked him to come to the police station to be interviewed.  Detective Miranda and Detective Everett Bercian interviewed defendant on August 28, 2017.  The interview was videotaped and played for the jury.

At the beginning of the interview, defendant denied touching Doe.  Detective Miranda used a ruse showing defendant a document that he claimed showed defendant's DNA was found in Doe's vagina.  Defendant admitted only to having sexual intercourse with Doe.  He then admitted that he put his finger in her vagina, and finally admitted to performing oral sex on her.  Defendant stated when asked if she was in the state of mind to consent, that neither of them were because of the alcohol and that he had "fucked up."[6]

After the interview with defendant, Detective Miranda obtained the results of the sexual assault exam.  Defendant's DNA was found on Doe's vagina.

---

[6] We will provide further detail of the interview, *post*.

9

### 4. *PRIOR INCIDENT*

R.B. was 33 years old at the time of trial and was defendant's third cousin. In 1999, when she was 14 years old, she was at defendant's house getting ready to go out trick-or-treating for Halloween. She thought defendant was 17 or 18 years old at the time. Defendant was upstairs and R.B. was downstairs listening to music with a friend. Defendant called her up to his bedroom. Defendant asked R.B. to kiss him. R.B. felt uncomfortable. She thought that she kissed him but she could not remember. Defendant then raped her by having sexual intercourse with her without her consent. He put his fingers inside her vagina. R.B. said it hurt her vagina. R.B. did not want to testify because she had decided not dwell on the incident and live her life. This was her first sexual experience.

### B. DEFENSE

Isaias estimated they all arrived at the El Torito at 10:30 a.m. and left around 3:30 p.m. While they were there, Doe kept talking to defendant and Evelyn appeared to be upset about it. Doe seemed "tipsy" during brunch. Loza had to help Doe to the car and at that point appeared to be drunk. He, defendant, and Jorge Sr. drank more beer when they got to the apartment. Doe fell asleep in defendant's bedroom. Defendant never told Isaias and Tanya that he was interested in Doe.

Defendant went to get pizza over one hour after they got back to the apartment. Isaias observed defendant go into the apartment while they were all at the pool before he went to get the pizza. Isaias recalled that at some point, defendant returned with the pizza.

Isaias went back to the apartment to go to the bathroom while defendant was gone. He checked on Doe and she was awake. She asked for a glass of water and seemed fine. No one else was in the apartment. Naomy came in the bedroom and he heard Doe tell her "Sorry." Tanya and Loza joined Naomy. Doe was crying and she told them not to touch her. Loza helped Doe to the car. Isaias believed that Doe was still drunk.

Isaias never heard Doe say that she told defendant "no" or that she could not get him off of her. Isaias admitted that defendant called him after Tanya's testimony and complained that she had lied. Isaias was upset because he believed Tanya to be a habitual liar. He admitted to calling her, accusing her of being a liar, and calling her a bitch. He denied that he threatened her.

Defendant testified on his own behalf. Doe sat across from him and Evelyn at El Torito. She asked Evelyn questions about his and Evelyn's relationship. He drank champagne during brunch and was intoxicated when they left. Doe drank Mimosas the entire time she was at El Torito but did not seem drunk at the restaurant. They left El Torito around 2:30 p.m. When defendant got back to his apartment, he drank more beers.

Defendant was aware that Doe vomited in the sink. Loza asked defendant if Doe could lay down on his bed. He was hesitant because he had a girlfriend and it did not "look right," but he agreed. He never told Tanya he wanted to be with Doe. Around 5:00 p.m., he went to the pool and told everyone he was going to get pizza. Defendant stopped by his apartment to get money.

Doe was waking up when defendant got into his apartment. He asked if she was okay and she responded, "I'm all right." Defendant told Doe, "I kind of like you," and

11

she responded "I do too." Defendant was very intoxicated. Defendant kissed Doe on the mouth and she kissed him back. They began kissing and he began rubbing her vagina. Doe grabbed defendant's penis over his clothes and began rubbing. He then performed oral sex on her. He lifted his head to kiss her but she pushed his head back down telling him she needed satisfaction. Defendant asked her to perform oral sex on him but she said no. Doe was moaning and appeared to consent. Doe moved her underwear and he inserted his penis in her vagina. Doe seemed to be consenting and knew she was engaging in sexual intercourse. Defendant only inserted his penis twice and then stopped because he felt guilty about his girlfriend. Defendant was putting his pants back on when Naomy entered the room. Doe said, "Fuck."

Defendant would not have engaged in sexual intercourse with Doe if he had not been drinking. Defendant said "Oops" when Naomy entered the room because he was putting his belt on. Defendant left the bedroom door open because the sexual acts were spontaneous and had not been planned.

Defendant initially lied to the police about having sex with Doe because he was embarrassed and Evelyn was waiting outside the police station for him. He lied to the police because he felt he had done something morally wrong, not legally wrong, and because he was afraid that Evelyn would find out. He admitted he told the detectives that Doe was not in right state of mind because of their drinking, but he insisted that she consented to the sexual acts. Although Doe had been drinking, she appeared to defendant to be willingly engaged in the sexual acts. Doe only said no to giving him oral sex.

12

Defendant was 17 years old when he had sex with R.B. He was convicted of unlawful sex with a minor. He lied to Detective Miranda that he had not been convicted.

## DISCUSSION

A.    VOLUNTARY STATEMENT

Defendant claims the trial court erred by admitting his statement to Detectives Miranda and Bercian because the statement was a result of their offers of leniency and coercion rendering his confession involuntary. The admission of his involuntary confession violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

1.    *ADDITIONAL FACTUAL HISTORY*

We have only reviewed the transcript of the interview on appeal as the parties have not asked this court to review the videotape of the interview. At the beginning of the interview, defendant spoke with the detectives about small businesses that he was involved in, one of which was with his girlfriend, Evelyn. The detectives expressed interest in his businesses. Detective Miranda asked defendant if he knew why he was being interviewed. Defendant responded that it was because Doe had said he touched her "which is absolutely . . . not true."

Defendant noted that Doe was "hammered" at El Torito. Doe was put in defendant's bed back at his apartment and they all went to the pool. Defendant told them he was going to get pizza for the family so he went to his room to change his shoes and belt. While he was changing his belt, one of the girls in the family entered the room and

13

thought he was doing something to Doe. When he came back from getting pizza, the family accused him of doing something to Doe.

Defendant insisted that he never touched Doe. Detective Miranda told defendant that other family members had advised him that defendant had gone into the room where Doe was sleeping, rolled her over and then penetrated her. He asked for oral sex but she said no, so he put his fingers in her vagina and performed oral sex on her. Defendant responded, "Absolutely not."

Detective Miranda then told defendant, "So, um, if you're telling me that you've never—you never touched her . . . [¶] . . . [¶] . . . but then I have evidence that your DNA is on her. I mean, how would you react to that?" Defendant responded, "How is my DNA on her if I didn't touch her?" Miranda told defendant that Doe went to the hospital and had a rape kit exam, and if defendant had been inside of Doe, they were going to know. Miranda then told defendant that they "did know" and they did not want defendant to screw up his life by lying. He told defendant that it was possible he was drunk or Doe asked for it. The detectives knew they had sex and by saying he had not touched her, he was either a "monster" or he was scared. Miranda understood that defendant was going to get in trouble with his girlfriend but told defendant it was "far worse" to lie to the detectives. Miranda asked defendant what he thought they were going to do if he lied, and defendant responded, "Lock me up." Miranda told defendant, "Exactly, man. Not going to lock you up but you're going to get in trouble with the law."

Detective Miranda told defendant they could start the conversation over and that he would not be offended that defendant had lied. However, Miranda told defendant that

14

if defendant continued to lie, Miranda would think defendant was a "monster," and "then I'll take . . . another approach." Miranda asked defendant if he wanted to tell him what had happened that day. Defendant responded, "We were both drunk." Defendant insisted he was not a monster and Doe never said no.

Defendant said he went into the bedroom, and Doe told him "Yeah, Uh, I kind of like you." Defendant responded to Doe, "Me, too," and they started kissing. Doe grabbed his penis and told him, "I need satisfaction." Doe moved aside her clothes and he penetrated her vagina two times then stopped. He denied performing oral sex or putting his finger in her vagina. He denied he forced himself on her or raped her; Doe wanted to do it.

Detective Miranda told defendant that Naomy had seen him kneeling on the ground with his head between Doe's legs. Defendant insisted that Naomy only saw him adjusting his belt. Defendant had stopped penetrating Doe because he could not finish the "task." He could not finish because, "she was drunk and I know better than that." Defendant said that he made a "stupid choice."

Detective Bercian then spoke to defendant. He told defendant that defendant was smart but that he had "fucked up." Bercian did not think defendant was the type of guy who would take advantage of a drunk girl and put his penis in her. Bercian and Miranda were trying to "humanize" him. They did not think he was a "monster" but rather, he was scared because he had "fucked up."

Defendant responded he initially lied to the detectives because he was scared; he was not a monster and had a lot to lose. Detective Bercian told defendant there was a

15

difference between sperm and saliva DNA and that defendant should tell them if he performed oral sex on Doe. Defendant admitted he put his fingers in her vagina but still denied performing oral sex on her. Detective Miranda told defendant the entire sexual assault kit was going to come back so he should be honest; "Fall on the sword and then move on with your life because lying's not gonna do anything for you Jorge." Miranda advised him, "Because we're not the only—when we present this case to the DA. Now if the DA gets this and they like, "Aw, man, Jorge's lying—lying—lying. He's not gonna admit to this? Well what can happen? They don't [know] who Jorge is because they didn't sit down next to him. . . . I have an idea who you are. Someone who wants to tell the truth but they're afraid to tell the truth until they're up against the wall." Miranda asked defendant why it was so hard for him to tell the truth about performing oral sex on Doe.

Defendant responded, "So it is to me. I fucked up." Detective Bercian reiterated that the district attorney was going to look at the interview and make a decision as to how to proceed with the case. The detectives were only seeking to have defendant tell the truth. Defendant then admitted to performing oral sex on Doe but insisted that no one saw him.

Defendant swore on his daughters' lives that Doe consented and that she forced his head down to give her oral sex. He only penetrated her twice. He insisted he was telling the truth. Detective Bercian told defendant, "Just—just listen to me. Tell the truth because this is going to help you out more than anything." Bercian asked defendant, "Do you think—do you think she was, uh, in a state of mind to give consent?" Defendant

16

responded, "None of us were." Bercian asked, "But do you think she was in a state of mind . . . ." Defendant interrupted and stated, "No. She wasn't." Bercian continued, ". . . to give consent?" Defendant stated, "That's why I said I fucked up."

Defendant was asked about the prior incident with R.B. and defendant claimed that she had lied and he was never convicted. Defendant was told that he was going to be arrested and booked for rape. Defendant insisted that Doe never pushed him away and did not stop him. He was willing to take a lie detector test about insisting she wanted him to pleasure her. As they were waiting for defendant to be booked, defendant discussed different ways of investing on the Internet with the detectives.

Before trial, defendant brought a motion to exclude his statement to police as involuntary, insisting that the police lied to him by showing him a false DNA report, threatened to lock him up, and called him a monster. The trial court, in ruling that the statement was admissible, noted that it had seen "hundreds, if not thousands" of interviews that were very similar. The trial court noted that the interview was "a-run-of-the-mill-type interview" in terms of questioning and answering. There was no yelling nor raised voices. The trial court felt that defendant was very intelligent and the conversation appeared friendly. The interview was short and defendant was not handcuffed. The detectives were polite. "So based on the totality of the circumstances, the Court does find that the confession or the interview was voluntary."

### 2. ANALYSIS

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial. [Citations.] ' "A statement is

17

involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) " 'Whether the confession was voluntary depends upon the totality of the circumstances.' " (*People v. Williams* (2010) 49 Cal.4th 405, 436 (*Williams*); *People v. Smith* (2007) 40 Cal.4th 483, 501.)

"In evaluating the voluntariness of a statement, no single factor is dispositive." (*Williams, supra,* 49 Cal.4th at p. 436.) "The presence of police coercion is a necessary, but not always sufficient, element. [Citation.] We also consider other factors, such as the location of the interrogation, the interrogation's continuity, as well as the defendant's maturity, education, physical condition, and mental health.' " (*People v. Caro* (2019) 7 Cal.5th 463, 492.)

"In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' " (*People v. Smith*, *supra*, 40 Cal.4th at p. 501; see also *People v. Jones* (1998) 17 Cal.4th 279, 297-298 (*Jones*).) "Police deception 'does not necessarily invalidate an incriminating statement.' " (*Smith,* at p. 505.) Deception does not undermine the voluntariness of a defendant's statement to the authorities unless the deception is ' " ' of a type reasonably likely to procure an untrue statement.' " ' " (*Williams*, *supra*, 49 Cal.4th at p. 443.)

In *Williams*, *supra*, 49 Cal.4th 405, the defendant claimed his confession was involuntary because the officer threatened he would suffer the death penalty if he did not

18

cooperate with them and lied to him that the defendant's fingerprints were found, which tied him to the crime. The California Supreme Court found that reference to the death penalty did not "necessarily" render the statement involuntary. A confession was only invalidated if " 'officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises.' " (*Id.* at pp. 442-443.) As for the deception by the officers that the defendant's fingerprints had been found, it noted that use "of deceptive comments does not necessarily render a statement involuntary." (*Id.* at p. 443.) The court concluded that "it is evident that neither the mention of the death penalty nor the deception overcame defendant's will" as he had prior experience with the criminal justice system, he showed no sign of distress, and ultimately denied responsibility. (*Id.* at pp. 443-445.)

In *Jones*, *supra*, 17 Cal.4th 279, superseded by statute on other grounds as stated in *People v. Johnson* (2013) 222 Cal.App.4th 486, the defendant made several statements to officers, admitting his involvement in a murder, and ultimately admitting to being the shooter. The defendant claimed on appeal that his statements were involuntary because the officers had promised leniency by telling the defendant that they would intercede with the district attorney on his behalf if he was honest and that the " 'truth is going to set you free.' " (*Jones*, at p. 281.) The officers also claimed to have "superior knowledge of the crimes and that it would be best for him to confirm facts they already knew, when in fact they did not know them." (*Id.* at pp. 295, 297-298.) The California Supreme Court found that the claims regarding leniency did not render the defendant's statement

19

involuntary as they were "truthful implications that his cooperation might be useful in later plea bargain negotiations." Further, as for deception, the court held, "Nor did the detective's deceptive statements offend any constitutional guaranty. The detective implied at various times that he knew more than he did or could prove more than he could. Such deception regarding the evidence was permissible, for it was not ' "of a type reasonably likely to procure an untrue statement." ' " (*Id.* at pp. 298-299.)

Here, defendant was told the results of the DNA test from the sexual assault exam had already been obtained and that his DNA was found in Doe's vagina. At that point, although defendant had maintained that he had not touched Doe, he then admitted to inserting his penis in her vagina. He still adamantly denied that he had performed oral sex on her or put his fingers in her vagina. In addition, at that point, he claimed the sexual intercourse was consensual. The showing of the DNA test did not result in a confession by defendant of all of the sex acts and he maintained that the sexual intercourse was consensual.

The detectives had spoken with Doe and the family members. It was evident that some sort of sexual encounter had occurred. It was not a lie that Doe had submitted to a sexual assault exam and that DNA results would be forthcoming. The detectives lied to defendant that they already had the results, but it did not result in defendant confessing to having sex with Doe without her consent.

The detectives also gave defendant a choice: he was either a monster or scared. At that point, defendant admitted that he penetrated Doe, but he insisted that the encounter had been consensual. He insisted they both expressed that they liked each

other and the sexual intercourse spontaneously occurred. Defendant did not confess at this point that he raped Doe but rather insisted that they had consensual sex. He also did not admit to performing oral sex on Doe or putting his fingers in her vagina. Defendant's will was not overcome and he did not incriminate himself as a result of the detective's ruse about the DNA and calling him a monster. (See *Williams*, *supra*, 49 Cal.4th at pp. 444-445.)

Moreover, suggesting to defendant that he would be better off telling the truth rather than lying did not render the statement involuntary. The court in *Williams* stated, " 'No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence.' [Citation.] Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth." (*Williams*, *supra*, 49 Cal.4th at p. 444.)

Here, we do not agree with defendant's claim that the detectives' insistence that he tell the truth was an implied promise of leniency. Rather, the detectives encouraged defendant to tell the truth, and made no promises as to what would happen to his sentence. They advised him of Doe's statements and what family members had seen in order to encourage him to tell the truth. The detectives advised defendant the district attorney would see the interview and would know defendant lied, but did not discuss the charges or sentence. Further, they advised him that it was up to the district attorney to file charges, but that the detectives just wanted the truth. These were not promises of leniency as there was no discussion of the charges, which would imply that if defendant told the truth he would receive a lesser sentence.

21

Further, defendant insists that the detectives threatened defendant by telling him they were not going to lock him up if he lied but he was going to be in trouble with the law. Defendant insists that this was an implied promise of leniency in that he would go free if he told the truth. In context, this was not an implied promise of leniency. The detectives were discussing defendant's concern that defendant's girlfriend would find out about the sexual encounter if he told them what had happened, was not as problematic as if defendant lied to them. It was not a promise that he would go free if he told the truth. These statements properly advised defendant that he would be better off if he told the truth and did not constitute threats or implied promises of leniency. (*Jones*, *supra*, 17 Cal.4th at pp. 297-299.)

Based on the totality of the circumstances, defendant's statement was voluntary. Defendant maintained throughout the interview that Doe had consented to the sexual acts. He swore on his daughters' lives that Doe consented. He acknowledged that they had both been drunk, but insisted she still consented. He offered to take a lie detector test as to the fact that Doe wanted to engage in the acts. Defendant's will was not overborne by the detectives and his statement as to the sexual acts committed was voluntary.

Defendant relies on *People v. Elias* (2015) 237 Cal.App.4th 568, 570, 574-575 (*Elias*). In *Elias,* the officers interrogated a 13-year-old boy who was suspected of committing a lewd and lascivious act upon a child who was three years old. The boy adamantly denied that he had touched her. The officer suggested that the boy had touched her vagina because he found it exciting or he was curious. The officer aggressively questioned the boy and made false representations, claiming witnesses saw

22

the boy touch her vagina when no such evidence existed. The boy then admitted he touched the girl's vagina because he was curious. (*Id.* at pp. 570-571, 574-575, 582-583.)

On appeal, the *Elias* court noted that the use of false evidence during police interrogation could cause young defendants to give false confessions. It stated, "[C]hildren and adolescents are much more vulnerable to psychologically coercive interrogations and in other dealings with the police than resilient adults experienced with the criminal justice system." (*Elias*, *supra*, 237 Cal.App.4th at p. 588.) The *Elias* court found the "accusatory interrogation was dominating, unyielding, and intimidating." (*Id.* at p. 586.) It found the statement involuntary based on the boy's youth, the absence of any corroborating evidence, and the likelihood the deception and tactics induced the boy to make an involuntary and untrustworthy admission. (*Id.* at pp. 586-587, 592-594, 597.)

Here, defendant was not a juvenile and was clearly not intimidated by the detectives. He talked with the detectives about running businesses and ended the interview discussing Internet investing. Further, there was corroborating evidence here, unlike in *Elias*, in that Doe's sexual assault examination revealed signs of forcible sexual acts, and defendant was seen by Naomy pulling up his shorts in the bedroom. Further, there is no evidence that Detectives Miranda and Bercian were "dominating" or "intimidating."

Moreover, the fact the detectives told defendant that he was either scared or a monster did not result in a false confession. Even though defendant had stated Doe was not in the right mind to consent, he then clarified that they were both drunk, and neither would have made the same choices if sober. The deception by Detectives Miranda and

23

Bercian did not overcome defendant's will as he maintained that Doe consented to the sexual acts.

Defendant's statement was properly admitted and did not violate his Fifth and Fourteenth Amendment rights under the United States Constitution.

B.      STAY OF FINES AND FEES

The People, in a footnote, contend the trial court erred by staying the restitution fine and fees imposed because it did not have the authority to stay those assessments or the restitution fine.

During sentencing, defendant's counsel requested that the trial court not impose the requested fines and fees in the case because defendant did not have the ability to pay. Defendant's counsel also requested that the trial court set the restitution fine at $300 but stay the imposition of the fine also because defendant did not have the ability to pay. The trial court ruled, "The Court will find no ability to pay based on [defendant]'s prison sentence and the fact that he is an indigent defendant represented by a government attorney. [¶] The Court will impose the minimum fines and fees applicable, but will stay the imposition of those fines." There was no objection by the prosecutor.

The minute order reflects that a $300 restitution fine (Pen. Code, § 1202.4, subd. (b)); a $300 parole revocation fine (Pen. Code, § 1202.45); a court operations assessment in the amount of $120 (Pen. Code, § 1465.8, subd. (a)(1)); and a criminal conviction assessment of $90 (Govt. Code, § 70373) were imposed and stayed.

The People have waived any claim on appeal that the trial court improperly stayed the restitution fine and the assessments. The prosecutor did not object to the stay of the

24

fines and fees in the trial court. "[U]nless a party makes a contemporaneous objection, he or she generally cannot challenge a court's ruling for the first time on appeal." (*People v. McCullough* (2013) 56 Cal.4th 589, 594.) This equally applies to the imposition of fines and fees. (See *People v. Tillman* (2000) 22 Cal.4th 300, 303 [failure of prosecutor to object to trial court's omission of mandatory restitution fine pursuant to section 1202.4 waived any claim on appeal that it should be imposed].)

While we recognize that the assessments pursuant to Government Code section 70373 and Penal Code section 1465.8 are mandatory, the prosecutor remained silent when defendant's counsel argued that the trial court should not impose the assessments and when the trial court decided to stay the assessments. Here, had the prosecutor objected, the trial court could have considered if it could properly stay the fines and fees, or could have chosen not to impose them. As such, the failure of the prosecutor to object waives the issue on appeal.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

J.

We concur:

RAMIREZ _____
P. J.

FIELDS _____
J.

25