Filed 10/7/21  P. v. Ramirez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALBERTO DEJESUS RAMIREZ et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B302257<br>(Super. Ct. No. NA102334)<br>(Los Angeles County) |

John Gilbert Alvarado, Alberto DeJesus Ramirez, and Ivan Hernandez appeal from the judgment after juries convicted them of first degree murder (Pen. Code, § 187, subd. (a)),[1] and convicted Hernandez of shooting at an occupied motor vehicle (§ 246) and two counts of premeditated attempted murder (§§ 664/187, subd. (a)).  The jury found true allegations that the death and great bodily injuries were caused by discharge of a

---

[1] Subsequent undesignated statutory references are to the Penal Code.

firearm (§ 12022.53, subds. (c) & (d)), and that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The trial court sentenced Alvarado and Ramirez to state prison for 50 years to life, and Hernandez for 114 years to life.

All defendants contend the trial court erred in not instructing the jury sua sponte regarding second degree implied malice murder.  Ramirez and Hernandez contend:  (1) the trial court erred by admitting Alvarado's hearsay statements against them as a declaration against penal interest, (2) uncorroborated accomplice testimony constituted insufficient evidence for conviction, (3) the court erred by failing to instruct the jury regarding accomplice testimony, and (4) cumulative errors require reversal.  Alvarado and Hernandez contend they are entitled to additional custody credits.  Hernandez contends his confession was involuntary and should have been excluded.  Ramirez contends the trial court erred in admitting evidence he possessed firearms unrelated to the charged crimes.  The Attorney General contends Ramirez's custody credits must be reduced, and Hernandez must be ordered to pay additional assessments.

We modify the judgments to correct the custody credits and to impose the required assessments.  In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Alvarado, Ramirez, and Hernandez were charged with the murder of Jose Pineda (count 1, § 187, subd. (a)).  Ramirez and Hernandez were charged with the attempted murders of S.G. (count 2) and M.T. (count 3) (§§ 664/187, subd. (a)) and shooting at an occupied motor vehicle (count 5, § 246).

2

The defendants were simultaneously tried by two juries: one for Alvarado and Ramirez, and the other for Hernandez.

### Attempted murders of S.G. and M.T.

On July 18, 2015, M.A. had a party in Wilmington for her daughter's baptism. At the party was her boyfriend Ronald, who was from San Pedro. The guests included S.G. and her boyfriend M.T., who had a visible "RSP" tattoo, referring to the Rancho San Pedro street gang. S.G. had a child whose father was a member of the East Side Wilmas street gang.

Shortly after midnight, M.A., Ronald, S.G., and M.T. drove to 25th and Leland Streets in San Pedro. M.A., asleep in the back seat, was awakened by gunshots. S.G. was shot in the leg and abdomen. M.T. was shot in his left shoulder.

A nearby resident heard approximately five or six gunshots. He saw a man shooting at a parked car. Another man was nearby. The two men ran down the sidewalk. Someone said, "Wilmas." The two men entered a dark gray car and sped away with "tires screeching."

Minutes after the shootings, Hernandez's mother texted Ramirez and asked if Hernandez was with him. Ramirez responded, "Yes, he is." About an hour later, Alvarado texted Ramirez that he was home. Ramirez texted that he and Hernandez were home, and warned Alvarado to be careful because police were everywhere.

### Murder of Jose Pineda

Two days later, several San Pedro residents observed two men chase Jose Pineda on the 13th Street sidewalk. Pineda had an "RSP" tattoo on the back of his head and a "Rancheria" tattoo on his head or body. One of the men screamed, "Where are you from?" A few seconds later, shots were fired.

3

One man appeared to be wearing gloves and shot a gun with an extended magazine clip and a long barrel using his left hand.  Alvarado is left-handed.

Pineda fell to the sidewalk.  One of the men walked up to Pineda and shot him three or four more times.  The two men ran down 13th Street toward the alley.

Pineda died of multiple gunshot wounds.  He had at least nine gunshot wounds, including wounds through his neck, arm, stomach, liver, lung, and brain.

Surveillance video from a nearby apartment showed two men walking south in the alley toward 13th Street, and later running north in the alley.  One wore gloves and held a long handgun in his left hand.

### *Investigation*

At the scene of the shootings of S.G. and M.T., police recovered 28 shell casings and two expended bullet rounds, all fired from a nine-millimeter firearm.

At the scene of the Pineda murder, police recovered 23 nine-millimeter TulAmmo shell casings fired from the same firearm as the shootings of S.G. and M.T., and five .380-caliber casings.  Some of the nine-millimeter casings were just inches from Pineda's body.  The number of nine-millimeter casings suggested the gun had an extended magazine.

A search of Hernandez's home recovered clothing similar to that worn by the suspects as shown in the surveillance video for the Pineda murder, including a long belt with a silver tip.

Police searched a shed with a makeshift bed where Ramirez stayed.  They recovered an unloaded .22-caliber revolver and three live .380-caliber rounds.  East Side Wilmas gang

4

graffiti was on the wall.

A search of Alvarado's home recovered a sweatshirt with writing on it that matched the one in the surveillance video, gloves, a nine-millimeter TulAmmo round, and a .380-caliber round.

### *Hernandez's confession*

Hernandez confessed to police that he was one of the shooters in both incidents.  The confession was presented to only his jury.

Regarding the July 19 shootings, Hernandez said M.A. invited him to the party, and he and Ramirez attended.  At the party, he saw Ronald and other "enemies" "from the Ranch." He felt threatened because they were looking at him "funny," and had "threatened" his family by passing by his house.  He "wanted to get revenge."

After the party, while driving Ramirez's gray Kia, Hernandez recognized two men from the party.  He parked the car, walked over to them, fired 10 to 15 rounds at them, then ran back to the car.

Regarding the murder of Pineda, Hernandez said he and a "friend" were "cruising" around San Pedro looking for Ronald.  Hernandez was wearing pants with a long belt.

They saw Pineda, who "banged on" them and was "throwing up R's and shit."  Pineda did not have a gun. Hernandez got out of the car and shot five rounds from a .22-caliber gun.  Hernandez said he and his friend "shot at" Pineda but did not "shoot him" and did not kill him.

## Perkins *operation*

Police conducted a "*Perkins* operation"[2] in which Alvarado was placed in a cell with two informants posing as gang member inmates and a recording device. Portions of the conversations were played for both juries.

Alvarado said: He was "Chiquito, from Eastside Wilmas." There was "tension" with "[f]ools from Rancho." A "fool" from "Pedro" was with a "homegirl." "That fool" and "[f]ools from Rancho" were entering Alvarado's "hood."

Alvarado said he and "Rocket" asked Pineda a question. Pineda responded "Pedro." Pineda's hands were in his pockets. Alvarado admitted shooting "that fool from Pedro" about 25 times with a nine-millimeter gun, including about seven times in the head and seven times in the neck. Alvarado said he was the "lead." He and Rocket used a Glock 17 and a .380, both with "extended burners." Alvarado had two "extendos." He "[made] sure he was dead in my face when I walked away."

Alvarado admitted he was the person running in the surveillance video. He said police also showed him pictures of Rocket. He said police showed him the sweatshirt he wore, and he "fucked up" by not getting rid of it.

Alvarado said the driver, "Pinky," was "from the hood." Alvarado said they all felt "happy" after the shooting.

### *Gang expert*

A gang expert testified that Alvarado, Ramirez (whose nickname is Pinky), and Hernandez (whose nickname is Rocket) were members of the East Side Wilmas gang. Rancho San Pedro was a rival of East Side Wilmas. If a woman had a

---

[2] *Illinois v. Perkins* (1990) 496 U.S. 292.

6

baby with a gang member and then dated a member of a rival gang, the first gang would retaliate.

### *Verdicts*

As to count 1, the jury found Alvarado, Ramirez, and Hernandez guilty of first degree murder (§§ 187, subd. (a)), 189, subd. (a)).  The jury found that Alvarado personally discharged a firearm causing death.  (§ 12022.53, subd. (d).)  It found that Hernandez personally discharged a firearm (§ 12022.53, subd. (c)), but found "not true" that it caused Pineda's death (§ 12022.53, subd. (d)).  As to Ramirez and Hernandez, the jury found that a principal discharged a firearm causing death (§ 12022.53, subd. (d)).

The jury found Hernandez guilty of the premeditated attempted murders of S.G. and M.T. (counts 2 and 3, §§ 664/187, subd. (a)), and shooting at an occupied motor vehicle (count 5, § 246).  As to each count, the jury found Hernandez personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)).  The jury found Ramirez not guilty of attempted murder and shooting at an inhabited vehicle (counts 2, 3, and 5).

As to all convictions, the jury found the crimes were committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)).

### DISCUSSION

### *Voluntariness of confession*

Hernandez contends his confession was involuntary and the trial court erred when it did not suppress it.  We disagree.

### *1. Interview*

Hernandez was 16 years old when he was arrested. He was interviewed at the police station over the course of five

hours. One of his hands was handcuffed to a chair. He was given water, used the restroom, and had several breaks in which he slept.

Hernandez said he had been to a juvenile camp for 11 months for assault with a deadly weapon, followed by six months for violation of house arrest. He was still on juvenile probation. His older brother was currently incarcerated for attempted murder, which an officer said made Hernandez "man of the house."

Hernandez was advised of, and acknowledged understanding, his *Miranda*[3] rights. The officers did not ask if he waived his rights but began questioning him. He said he was not nervous.

Hernandez denied involvement in another shooting incident.[4] Officer Romulo said they had evidence he was the shooter, that it was "not looking good" for him, and they "just want to see [his] side." Officer Williams suggested there might be "more to" the story, and someone might have shot at Hernandez first. Williams said, "if you walk out of here saying, hey, I wasn't there" and other people said he shot the victim, "it's not gonna go well in court" because the judge would not believe him.

Williams said, "[L]et's rewind here for a second. Okay? Because I want to believe you." Hernandez responded, "No. I'm done already." Williams said, "Let me ask you this." Hernandez responded, "I'm done." Williams asked, "You sure you want to leave it like that, man?" Hernandez continued to deny he was present at the shooting. He asked, "what do you want me to

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

[4] The jury deadlocked on this count and it was dismissed.

8

tell you so I could tell you?" Williams responded, "The truth."

Romulo said this was the brief "window of opportunity" for Hernandez to say "what really happened." Romulo discussed Hernandez's brother being in prison and said, "This is your opportunity not to go there."

Detectives Halka and Reynoso then interviewed Hernandez regarding an unrelated murder. Halka said he was worried that someone would come looking for Hernandez and end up hurting his mother, brother, or sister. Halka said, "I would hate to see somebody get hurt—[¶] . . . [¶]—off of you not telling the truth. Because if you're—[¶] . . . [¶]—telling me the truth and then—[¶] . . . [¶]—if there is something up with it, I can't help you. [¶] . . . [¶] I can help your family." Hernandez continued to state he had not done anything.

Detectives Maffei and Romulo then questioned Hernandez about the shooting of S.G. and M.T. Maffei stood at first, stating that the interview would not take long because up to that point, Hernandez was "full of shit." Less than five minutes later, he sat down for the rest of the interview.

Maffei said some "Ranchers" were at the party, and Hernandez was "pissed." He said that Hernandez followed them to San Pedro and shot at them at 25th and Leland. A few days later, Hernandez looked for them but found someone else. Hernandez denied he was involved.

Maffei mentioned Hernandez's little brother and sister and said, "Now is the time to be honest with us, because without you at home with them, who's gonna protect them? [¶] . . . [¶] Because, now, Ivan's not around anymore—[¶] . . . [¶]—because he lied to the police." He continued, "And if you want to try to tell your side of the story, now is the time to do

9

it.  Otherwise, you're going away forever.  You'll never see your mom again.  You'll never see your little sisters.  You won't be out there to protect them."  Hernandez continued to deny being at the party.

Maffei said, "if you want to get out at some point to see your little sister and your little brother, then now's the time to tell the truth."  The following exchange then occurred:

"[Maffei]:  So what I need to know from you is what happened at that party and what pissed you off so much regarding the guys at the party and the girls at the party that caused the incident at 25th and Leland.

"[Hernandez]:  I'm gonna go to jail anyways.

"[Maffei]:  If you lie you're going to jail for a long time.  You tell me the truth, maybe there's something we can do about it.  But I guarantee you if you lie to me because you know I know a little bit about what I'm talking about, you lie to me, there's a good chance you're going away forever.  Okay?"

Hernandez then made incriminating statements about the crimes.

## 2.  *Denial of motion*

The trial court stated that Hernandez had prior experience in the system and did not look scared in the video.  It noted that Hernandez was "holding firm" in his denials when officers made general assertions about the crimes, but confessed once they proved they had done their "homework" by describing the evidence in detail.  He confessed at that point because he realized "the jig is up," not because of references to his family.  The court noted that Hernandez was given several breaks between questioning and that the recording included a "very relaxed conversation" with a detective about basketball.

10

### 3. *Discussion*

The federal and state constitutions prohibit use of involuntary confessions. (*People v. Dykes* (2009) 46 Cal.4th 731, 752.) Courts consider the "'totality of the circumstances.'" (*Ibid*.) "'The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed."'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347.)

The voluntariness of a confession must be established by a preponderance of the evidence. (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 346.) "'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.'" (*People v. Holloway* (2004) 33 Cal.4th 96, 114.) "'"When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness."'" (*McWhorter*, at p. 346.)

After acknowledging that he understood his *Miranda* rights, Hernandez implicitly waived them by answering questions. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1169.) "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative" as to voluntariness. (*Oregon v. Elstad* (1985) 470 U.S. 298, 318.)

Stating that a suspect is facing a severe punishment, and suggesting that he "would benefit from giving a truthful, mitigated version of the crimes," does not render a confession involuntary. (*People v. Holloway*, *supra*, 33 Cal.4th at p. 115.) The police here "did not represent that they, the prosecutor or the

11

court would grant defendant any particular benefit if he told them how the [crimes] happened." (*Id*. at p. 116.)  They "did no more than tell defendant the benefit that might "'flow[ ] naturally from a truthful and honest course of conduct.""" (*Ibid*.)  "The overall import of the interrogation was appropriate in that the officers presented defendant with incriminating evidence, emphasized the seriousness of the charges, and urged him not to lie, because lies would antagonize the court and the jury." (*People v. Williams* (2010) 49 Cal.4th 405, 442.)  The officers permissibly suggested possible explanations of events and asked the defendant to provide details.  (*Id*. at p. 444.)

Even when police engage in coercive activity, it renders a confession involuntary only if it is the proximate cause of the statements.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 814.)  The record here does not establish that Hernandez's statements were the result of improper statements.

Hernandez continued to exercise free will even after he decided to admit some of his conduct.  Although he admitted his involvement in the shooting of Pineda, he maintained that he only shot "at" him, and declined to provide the name of the other shooter.

This case is unlike *In re Elias V*. (2015) 237 Cal.App.4th 568, 570-571, cited by Hernandez.  The suspect there was 13 years old and had no prior contacts with police.  (*Id*. at p. 591.)  Police asserted his guilt of child molesting as a fact without having evidence to support it.  (*Id*. at p. 593.)  Police employed the "false choice" strategy by offering him only two possibilities: that he acted based on natural "'curiosity,'" or did what any "normal person" would find "'exciting.'"  (*Id*. at pp. 584-586.)  When the minor accepted the detective's assertions as to what

12

happened, it was unclear that he understood he was admitting a crime. (*Id*. at pp. 593-594.)

In contrast here, Hernandez was 16 years old and understood the significance of his admissions. His experience in the criminal justice system was a factor showing his confession was voluntary. (*People v. Williams*, *supra*, 49 Cal.4th at p. 442.) Police had a factual basis for their assertions and did not present Hernandez with a false choice.

Nor is this case like *In re T.F.* (2017) 16 Cal.App.5th 202, also cited by Hernandez. The minor there was 15 years old with a diagnosed intellectual disability and was sobbing and distraught throughout the interview. (*Id*. at pp. 212-213.) He had minimal prior contact with police. (*Id*. at p. 221.) Hernandez was not disabled, had been sent to juvenile camp before, and was calm during the interview.

Hernandez relies on Welfare and Institutions Code section 625.6, which requires that a minor consult with counsel before a custodial interrogation. The statute was not enacted until after Hernandez was questioned. (Stats. 2017, ch. 681, § 2.) At the time the trial court heard the motion to suppress the confession, the statute applied only to minors age 15 or younger. (*Ibid*.) While the legislative findings underlying Welfare and Institutions Code section 625.6 discuss the cognitive development of juveniles (Stats. 2017, ch. 681, § 1; Stats. 2020, ch. 335, § 1), the statute does not provide an independent basis to suppress a statement. (*In re Anthony L.* (2019) 43 Cal.App.5th 438, 450.)

### *Firearm possession*

Ramirez contends the trial court erred when it admitted evidence that police found an unloaded .22-caliber

13

revolver unrelated to the crimes in the shed where he stayed, and a text message that someone left a gun in his car. We disagree.

Ramirez forfeited his challenge to the gun in the shed by failing to object in the trial court. (*People v. Flinner* (2020) 10 Cal.5th 686, 726-727.)

Ramirez received the text message three weeks before the murder. It stated that a .22-caliber gun was left in his car. Ramirez objected that the prejudicial effect of the evidence outweighed its probative value. (Evid. Code, § 352.) The prosecutor offered the evidence to show "Ramirez's reliability as a driver and somebody who you can store your guns in the car." As such, it was probative and not unduly prejudicial. The court found that whether or not the sender of the text was a gang member went to the weight rather than the admissibility of the evidence and overruled the objection. The trial court did not abuse its discretion when it allowed the evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

Ramirez forfeited the argument that the text was improper character evidence (Evid. Code, § 1101) because he did not make that objection in the trial court. (*People v. Flinner*, *supra*, 10 Cal.5th at pp. 726-727.) The argument also fails on the merits because the evidence was not admitted for the improper reason to show Ramirez "is the sort of person who carries deadly weapons," but to show he transported another person with a deadly weapon who trusted him with its possession. (See *People v. Cox* (2003) 30 Cal.4th 916, 956-957, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### Declaration against interest

Ramirez and Hernandez contend the trial court erred in admitting Alvarado's statements against them. We are not

14

persuaded.

Alvarado's statements were admitted pursuant to the hearsay exception for declarations against penal interest.  (Evid. Code, § 1230.)  We review the ruling for abuse of discretion. (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)

A defendant's declarations against interest that implicate a codefendant are admissible if they are "'specifically disserving to the interests of the declarant.'"  (*People v. Duarte* (2000) 24 Cal.4th 603, 612.)  To be admissible, the statements must be trustworthy.  (*Id.* at p. 614.)  Whether they are trustworthy is based on "the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry."  (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.)  Statements implicating both the declarant and a codefendant are trustworthy when "made under circumstances that . . . suggest reliability . . . such as statements made to a personal acquaintance in a noninvestigatory context where the setting suggests no motive to speak falsely" or to "shift blame or curry favor."  (*Id.* at pp. 334-335.)

The court is not required "to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant."  (*People v. Grimes*, *supra*, 1 Cal.5th at p. 716.)  The "statement is more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility . . . as opposed to attempting to assign greater blame to others." (*Ibid.*)

The trial court found Alvarado's statements were

15

trustworthy because he believed he was talking to fellow gang members.  He spoke about incidents at which he was present and participated.  He admitted a greater role in the murder than Ramirez or Hernandez.  He did not attempt to shift blame, but admitted he was the "lead" in the killing, that he shot the victim numerous times in the head and neck, and made sure he was dead.  Alvarado's statements about Ramirez and Hernandez were trustworthy because they "were an integral part of the statement in which he implicated himself" as the person primarily responsible.  (*People v. Greenberger*, *supra*, 58 Cal.App.4th at p. 340.)

This case is not like *People v. Lawley* (2002) 27 Cal.4th 102, 151-155, cited by Ramirez and Hernandez.  There, the trial court did not abuse its discretion when it excluded an inmate's statement that he committed murder because he was paid to do so by the Aryan Brotherhood.  Because he was seeking membership in the Aryan Brotherhood, the statement "was not specifically disserving of his interests" but "might have been an exercise designed to enhance its prestige or his own."  (*Id.* at pp. 154-155.)  Here, the trial court determined that the statements naming Ramirez and Hernandez were an integral part of a statement that specifically disserved Alvarado's interests.

*People v. Lawley*, *supra*, 27 Cal.4th 102, was distinguished in *People v. Samuels* (2005) 36 Cal.4th 96, 120-121.  There, a conspirator's statement that the defendant paid him to commit the murder was properly admitted.  As is the case here, the statement was "in no way exculpatory, self-serving, or collateral . . . or an attempt to shift blame."  (*Id.* at p. 120.)  "Instead, the reference was inextricably tied to and part of a specific statement against penal interest."  (*Id.* at p. 121.)

16

Nor is this case like *People v. Gallardo* (2017) 18 Cal.App.5th 51, cited by defendants.  There, a defendant attempted to minimize his role, claimed he was only the getaway driver, and identified the codefendants as the shooter and the driver of the vehicle from which the shots were fired.  (*Id*. at pp. 73-75.)  Here, Alvarado admitted being the "lead" shooter who shot the victim in the head and neck to make sure he was dead.  Discussion of the roles of Ramirez and Hernandez specifically disserved Alvarado because it showed concerted effort for the benefit of a criminal street gang.  And unlike *Gallardo*, where the trial court admitted the transcript of the entire discussion with informants (*id*. at p. 72), the trial court here excised statements that were not specifically disserving of Alvarado's interests.

The trial court did not abuse its discretion in admitting the statements.  Because the trial court followed the law regarding declarations against interest, the court did not deny Ramirez or Hernandez's right to due process or liberty interest by misapplying state law.  (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73; *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346.)

### *Corroboration of accomplice*

Ramirez and Hernandez contend the evidence was insufficient to convict them of Pineda's murder because it was based on uncorroborated statements of an accomplice.  They are incorrect.

In general, section 1111 requires corroboration of accomplice testimony, or "'"out-of-court statements of accomplices . . . used as substantive evidence of guilt which are made under suspect circumstances."'"  (*People v. Brown* (2003) 31 Cal.4th 518, 555, italics omitted.)  But "'[t]he usual problem with accomplice testimony—that it is consciously self-interested and calculated—

17

is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed in evidence.' [Citation.]" (*Id.* at pp. 555-556.) Because the statements "were themselves made under conditions sufficiently trustworthy to permit their admission into evidence . . . [as] declarations against his penal interest . . . no corroboration was necessary." (*Id.* at p. 556.)

### *Accomplice instruction*

Ramirez and Hernandez contend the trial court erred in failing to instruct the jury sua sponte that Alvarado was an accomplice whose statements must be corroborated and viewed with caution. There was no error.

The defendants did not request accomplice instructions. (See CALJIC Nos. 3.10—3.20; CALCRIM Nos. 334, 335.) Because Alvarado's statements were sufficiently trustworthy to be admitted as declarations against interest, "the court was not required to instruct the jury to view [the] statements with caution and to require corroboration." (*People v. Brown, supra*, 31 Cal.4th at p. 556.)

### *Second degree murder instruction*

Defendants contend the trial court erred in not instructing the jury with CALJIC No. 8.31[5] regarding second

---

[5] CALJIC No. 8.31 states: "Murder of the second degree is [also] the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an intentional act it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (CALJIC No. 8.31 (Spring 2009 revision), bracketed language imposing liability for

18

degree murder based on implied malice.  They are incorrect.

We review de novo the claim that the trial court erred when it failed to give the jury instruction.  (*People v. Wilson* (2021) 11 Cal.5th 259, 295.)  Even where, as here, the defendants did not request the instruction, "'""the trial court must instruct on the general principles of law relevant to the issues raised by the evidence."'""  (*Ibid.*)

A jury instruction is not required if it is duplicative. (See *People v. Scully* (2021) 11 Cal.5th 542, 592-593.)  Failure to give CALJIC No. 8.31 was not error because "the other instructions provided by the trial court adequately imparted this information to the jury."  (*People v. Lucas* (2014) 60 Cal.4th 153, 295, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

Both juries received CALJIC No. 8.11, which defines implied malice in language "virtually identical to CALJIC No. 8.31."  (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104.) "CALJIC No. 8.11 . . . contains everything necessary to fully instruct the jury on this form of [implied] malice as a possible theory of second degree murder."  (*People v. Chun* (2009) 45 Cal.4th 1172, 1202.)  The juries were further instructed that: first degree murder requires "willful, deliberate and premeditated killing with express malice aforethought" (CALJIC No. 8.20), second degree murder requires "malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation" (CALJIC No. 8.30), the jury must determine the degree (CALJIC No. 8.70), and the jury must find the murder to

_____

failure to act deleted.)

be of the second degree if it has a reasonable doubt as to degree (CALJIC No. 8.71).

The court instructed as to both degrees of murder, and the jury selected first degree. By finding the murder was deliberate and premeditated, the jury rejected the theory that the killing resulted from commission of a dangerous act with conscious disregard for human life without the intent to kill.

### *Cumulative error*

Ramirez and Hernandez contend their convictions must be reversed based on cumulative error that denied their state and federal rights to due process and fair trial. Because we have rejected defendants' claims of error, "we likewise conclude that the cumulative effect of these asserted errors was not prejudicial and does not require reversal." (*People v. Bonilla* (2007) 41 Cal.4th 313, 360.)

### *Credits and assessments*

Alvarado and Hernandez correctly contend that their presentence custody credits were improperly calculated and that each is entitled to two additional days. The Attorney General agrees. We order Alvarado's judgment be modified to show 1,470 actual days custody credit, and Hernandez's judgment be modified to show 1,512 actual days custody credit.

The Attorney General correctly contends that Ramirez's presentence credit award of 1,501 actual days is three days too many. He was arrested on August 19, 2015, and sentenced on September 24, 2019. The correct calculation is 1,498 days. We must correct the overcalculation of custody credits as an unauthorized sentence when the Attorney General raises the issue in a defense appeal. (§ 1252; *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6; *People v. Johnson* (2015) 234

20

Cal.App.4th 1432, 1457.)

The Attorney General also contends that Hernandez's judgment must be modified to impose additional assessments. We agree. The trial court imposed a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)) and a $40 court operations assessment (§ 1465.8, subd. (a)). Because Hernandez was convicted of four counts, the court must impose four $30 court facilities assessments (*People v. Lopez* (2010) 188 Cal.App.4th 474, 480) and four $40 court operations assessments (*People v. Roa* (2009) 171 Cal.App.4th 1175, 1181).

## DISPOSITION

The judgments are modified to correct the actual days of presentence credit to 1,470 days for Alvarado; 1,512 days for Hernandez; and 1,498 days for Ramirez. The judgment against Hernandez is modified to impose four $30 court facilities assessments (Gov. Code, § 70373, subd. (a)) and four $40 court operations assessments (§ 1465.8, subd. (a)). The clerk of the court shall amend the abstracts of judgment and forward certified copies to the Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED.


TANGEMAN, J.


We concur:


YEGAN, Acting P. J.                PERREN, J.


21

Laura L. Laesecke, Judge

Superior Court County of Los Angeles

_____

        John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Alberto Ramirez.

        Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Ivan Hernandez.

        Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant John Alvarado.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven E. Mercer and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.